# THE FARM INVESTMENT COMPANY v. CARPENTER ET AL.

WATER RIGHTS — APPROPRIATION — PUBLIC CONTROL — CONSTITUTIONAL LAW — TITLE OF STATUTES — ONE SUBJECT — STATUTORY CONSTRUCTION — WATERS PUBLICI JURIS — STATE OWNERSHIP — STATE BOARD OF CONTROL, JURISDICTION OF — ADJUDICATION PROCEEDINGS — RES JUDICATA — JURISDICTION OF COURTS — FAILURE OF CLAIMANTS TO SUBMIT PROOFS — NOTICE BY MAIL, VALIDITY OF PROVISION FOR — DUE PROCESS OF LAW — RESERVED QUESTIONS.

1. The doctrine prevails in this State, that a right to the use of water may be acquired by priority of appropriation for beneficial purposes, in contravention to the common law rule that every riparian owner is entitled to the continued natural flow of the waters of the stream running through or adjacent to his lands.

2. An appropriation consists in a diversion of the water by some adequate means, and its application to a beneficial use.

3. In the progress of the legislation of this State, respecting the use of water, the significant feature of the changes and additions from time to time has been the principle of centralized public control and regulation.

4. If but one general and comprehensive subject is contained in a legislative act, and all the provisions are germane to that subject, then the act can not be said to violate either the spirit or letter of the constitutional requirement that no bill, except general appropriation bills, etc., shall be passed containing more than one subject, which shall be clearly expressed in its title.

5. An act entitled "An act providing for the supervision and use of the waters of the State," approved December 22, 1890, provided for the adjudication of rights to the use of the public waters, by the State Board of Control. *Held*, that the one general subject of the act was the supervision of the waters of the State, and the matter of determination of priorities is a part of the general subject and germane to it; and that the act was not void, as to such provisions, as containing more than one subject.

6. A statute is to receive every presumption in favor of its validity, and is not to be overthrown by the courts unless it is clearly unconstitutional.

7. Where the doctrine prevails, as in this State, that rights to the use of the water of natural streams, etc., may be acquired by prior appropriation, the waters affected thereby become, perforce, *publici juris;* and an expression by constitution or statute that the waters subject to such appropriation are public, or the property of the public, declare and confirm a principle already existing, instead of announcing a new one.

8. The declaration of the constitution that the waters of natural streams, etc., are the property of the State is valid and effectual, as to waters subject to the doctrine of prior appropriation; and such declaration is not objectionable on the ground that the United States is the primary owner of the soil, and, as such, possessed of title to the waters of the streams flowing across the public lands; since the act of Congress admitting the State accepted, ratified, and confirmed the Constitution, and, since by reason of the nature of the right to acquire a prior right to the use of water, the waters affected thereby, are necessarily public waters, and the United States has by several acts of Congress recognized that right.

9. When existing vested rights are not unconstitutionally interfered with, the people in their organic law may declare the waters of all natural streams, and other natural bodies of water to be the property of the public or of the State; and when not restrained by the constitution, the legislature may make a like declaration.

10. The ownership of the State is for the benefit of the people or the public. By either phrase, "property of the public" or "property of the State," the State is vested with jurisdiction and control in its sovereign capacity; there being no appreciable distinction between the two expressions, under the doctrine of prior appropriation.

11. The constitutional declaration as to State ownership of water was not intended to interfere with previously accrued rights to use the public waters, and it does not conflict with such rights; it was, however, intended by the constitution that such rights, and all appropriations, should be regulated upon the fundamental principles therein enunciated.

12. The act conferring upon the State Board of Control the power to adjudicate the priorities of the various claimants to the use of the public waters of the State is not invalid as investing the board with judicial powers, and is not in conflict with the constitutional provisions which vest the judicial power of the State in certain courts.

13.   The Board of Control acts in an administrative capacity, and the determinations which it is required to make under the act, are such as may be conferred upon executive officers or boards.   While it acts judicially, the power exercised is *quasi* judicial only.

14.   The State may regulate prior as well as subsequent rights of appropriation.   The legislature may legally require all parties claiming an appropriation of water to submit their claims for determination, that the evidence of the right may consist in the decision of a legally constituted tribunal, and that the interests of the public and all interested parties may be protected.

15.   In adjudication proceedings before the board instituted by it in pursuance of the act, all claimants are required to submit proof of their claims, whether their rights accrued anterior to the constitution and the present statute, or since.

16.   In the absence of fraud or collusion, any matter actually and legally determined by the final decree of the board of control becomes *res judicata* — at least, as to the public and the parties participating in the proceedings.

17.   No penalty being imposed upon a claimant who fails to appear and submit proofs of his claim, and there being no express limitation upon a subsequent assertion of his rights by legal proceedings, or in some manner authorized by law, if any; an existing claimant is not concluded by a determination of the board of control, in adjudication proceedings, under the statute, wherein he has not appeared, and his right has not been considered.

18.   In the absence of a previous determination by the board, or in the courts, of the priorities or rights of claimants, upon a particular stream, an interested party may resort to the courts to obtain such relief as he may show himself to be entitled to; but the principle here applies, as in other cases, that a party may not relitigate a question which has passed into final adjudication.   And the courts will not assume, in an independent action, to determine anew the rights of parties, which, as between themselves, have been settled by the decree of the board of control — at least, in the absence of fraud, or a showing of facts sufficient to vitiate a judgment.

19.   The statutory provision for notice by registered mail to known claimants as to the time for the taking of testimony in adjudication proceedings is not objectionable, on the ground that it does not constitute due process of law.

20.   In reserved cases a question whether the answer is sufficient to constitute a defense will not be answered; as such a

> question must be decided by the trial court upon the princi-
> ples laid down upon the reserved questions, if they affect the
> sufficiency of the answer.

[Decided May 26, 1900.]

On reserved questions from the District Court, Johnson County, Hon. Joseph L. Stotts, Judge.

Action to quiet title to a right to the use of water.

The case is fully stated in the opinion.

*James W. Mc Creery and Alvin Bennett*, for plaintiff.

Irrigation was practiced from the beginning of the civilized settlements of the arid regions of this country; and the first taker was conceded to have the first right. That principle became the fundamental formula of law concerning the acquisition of property and water rights for beneficial uses. The right thus became an original property right resting on the law of necessity. Priority of use among different claimants from the same stream determines the seniority of a continual and perpetual right. When such rights have attached, the principle of vested rights intervenes to protect them through all the mutations and theories of subsequent legislation. (U. S. Rev. St., Sec. 2339; Atchison v. Peterson, 20 Wall, 507; Basey v. Gallagher, id., 670; Jennison v. Kirk, 98 U. S., 453; Thorpe v. Freed, 1 Mont., 651; Broder v. Natona W. Co., 101 U. S., 274; Krall v. U. S., 79 Fed., 241; Union M. & M. Co., 81 id., 73; Howell v. Johnson, 89 id., 556.) The right was recognized, not only by Congress, but the various States of the arid region by statute and decision of courts recognized the same principle from the earliest times. (Irwin v. Phillips, 5 Cal., 140; Osgood v. W. & M. Co., 56 id., 571; Lobdell v. Simpson, 2 Nev., 274; Van Sickle v. Haines, 7 id., 287; Jones v. Adams, 19 id., 78; Yunker v. Nichols, 1 Col., 551; Shilling v. Rominger, 4 id., 100; Coffin v. Left Hand D. Co., 6 id., 442; Platte W. Co. v. Nor. Col. I. Co., 12 id., 525; Moyer v. Preston, 6 Wyo., 308; Wyo. R. S., Sec. 1311–1361; Car-

son v. Gentner, 52 Pac., 506, 33 Or., 512; Drake v. Earhart, 23 Pac., 541, 2 Ida, 716; Hill v. Van Normand, 16 Pac., 266 (Ari.); Stowell v. Johnson, 26 Pac , 290, 7 Utah, 215; Trambley v. Luterman, 27 Pac., 312, 6 N. Mex. 15.) From the foregoing, it appears to be well established that the innavigable streams and the water flowing therein were a part of the public domain. No federal or State statute can be said to confer the right to take the water; the most they can do is to regulate the use under the police powers of the State for the health and peace of the community. (Cases above cited and Ft. M. L. & Co., 18 Colo., 1; Frank v. Hicks, 4 Wyo., 502.)

Titles to property are not acquired by assertion or the wish to possess, and since all the innavigable streams and the waters therein and lakes and still waters found within the boundaries of this State, were formerly part of the public domain of the United States, the government can not become divested of its title by the declaration of the State constitution that they are the property of the State. The act of admission granted certain lands to the State, and the grant excludes by implication things not enumerated. (Sedg. Const., 31; Com. v. Ins. Co., 98 Mass., 29; M. E. Ch. v. Joques, 3 Johns. Ch., 110; U. S. v. Arrendondo, 6 Pet., 725; Howell v. Johnson, 89 Fed., 556.)

The powers of the State government are distributed into three departments. (Const. Art. 2, Sec. I.) There is an absolute prohibition against the exercise by one department of powers belonging to another. The principle, however, is fundamental. Mont. Spirit L., Vol. I, p. 172. It was one of the foundations of the Federal constitution. (Kilbourne v. Thompson, 103 U. S., 188; Dash v. VanKleck, 7 Johns., 477; Webster's Works, Vol. 4, 122.) What constitutes judicial power is to be determined in the light of the common law and the history of our institutions, as they existed anterior to, and at the time of the adoption of the constitution. (State v. Harman, 31 O., 250; Culman v. Judd,

23 Wis., 343; Houston v. Williams, 13 Cal., 27; Cooley Const. Lim., 109.) At the time of the adoption of the constitution, the determination of water rights was vested in the courts. The jurisdiction of the courts is carefully marked out in the constitution, and that of the district court includes original jurisdiction of all causes in law and equity, and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court. The constitutional provisions creating the Board of Control do not create a jurisdiction in matters judicial for the board. When the constitution confers the judicial power upon certain specified courts, this must be understood to embrace the whole judicial power, and the Legislature can not in such case pass a statute abolishing such courts or vest any portion of the power elsewhere. (Bondy Sep. Gov. Pow., 31; Chandler v. Nash, 5 Mich., 409; Zander v. Coe, 5 Cal., 230; State v. City, 14 Ill., 420; Kilbourn v. Thompson, 103 U. S., 188.)

The act in question is unconstitutional in so far as it attempts to confer upon the board judicial power. A court is provided by the act and a trial. (Wilson's Works, Vol. 2, 75; Ry. Co. v. Minn., 134 U. S., 457.) Pleadings are provided for. The attempt to give to the board such powers is manifestly repugnant to the separation of the power of government. The Legislature can not withdraw from judicial congnizance any matter, from its nature, the subject of a suit at common law or in equity. (Murray v. Hoboken, 18 How., 284.)

The act is void in the respect named because it attempts to set up new grounds for the right of property in water — different elements in making appropriations than those existing prior to the constitution. The priority of appropriation which gives the better right must mean the same thing or precisely what it meant in 1890. One thing that an appropriation means or meant is that the appropriator could take from the stream up to the full measure of his necessities, another, that he could change the place and character of the use; and that he had a property

which he could sell. (McDonald v. Bear R. Co., 13 Cal., 220; Thompson v. Guirand, 6 Colo., 532; Larimer Co. R. Co. v. People, 8 id., 616; Min. Co. v. Carpenter, 4 Nev., 544; Wheeler v. N. Colo. Irr. Co., 10 Colo., 582; Sieber v. Frink, 7 id., 154; Fuller v. Swan R. P. M. Co., 12 Cal., 10; Strickler v. Colo. Springs, 16 id., 61; Junkans v. Bergin, 67. Union M. & M. Co. v. Dangberg, 81 Fed., 73.) From the rulings of the board it is evident that the changes sought to be effected are based upon the assumption of state ownership. The act in question changes retrospectively the meaning of the terms employed by the constitution; creates new rules of property; changes acquired rights of property in appropriations to water, and is void for those reasons.

The act is also void as in conflict with Section 24 of the constitution, requiring that no bill shall contain more than one subject. To supervise does not mean to adjudicate, to determine, to decree, or to order. It means to obey orders, and oversee their execution. If the word is broad enough to cover the determinations provided in the act, then the title does not clearly express the subject. (Skinner v. Wilheim, 63 Mich., 568; Howlett v. Cheetham (Wash.), 50 Pac., 522.)

The statute can not have any application to rights that were acquired or had vested, prior to the constitution and the passage of the act. To give it such an application is to give a retrospective effect whereby vested rights may be defeated, and contracts existing at and before the law, may be impaired. That would be illegal. (Const. Art. 1, Sec. 35; 1 Kent's Com., 455; Potter's Dwarris, 162, 165–66; Sedg. Const., 173; Willoughby v. George, 5 Colo., 81; Dash v. Van Kleek, 7 Johns., 477; Williamson v. Field's Ex'rs., 2 Sandf., 533; Wilkinson v. Leland, 2 Pet., 656; Dartmouth Coll. v. Woodward, 4 Wheat.,518.)

The procedure does not constitute due process of law. Constructive notice will only operate, except in certain cases, in proceedings *in rem*, and will then only bind the property seized or what is equivalent thereto. (Web-

ster v. Reid, 11 How., 437; Pennoyer v. Neff, 95 U. S., 714; Hart v. Sansom, 110 id., 151; Union Colony v. Elliott, 5 Colo., 22; Cooley Const. Lim., 431, *et seq.*)

The act is not a police regulation, and none of its provisions, concerning the board, nor the consequences sought to be obtained, come within any proper definition of the police power. That power extends to the protection of the lives, limbs, health, comfort, and quiet of all persons and the protection of all property within the state. (Tiedeman Pol. Pow., Sec. 1; Farmer's Ind. D. Co. v. Agr. D. Co., 45 Pac., 444.) The manifest purpose is to create, not to regulate.

*C. II. Parmelee* and *G. E. A. Moeller*, for defendants.

Of all the arid States, irrigation was latest of development in Wyoming. It need not be supposed that we should follow all the errors and experimentation which has from time to time crept into the decisions of other States. We have taken advantage of the experience of others. While we have embodied in our laws what has been found good and efficient in the laws of other States, we have not adopted some which have been found to lamely protect the public interest. The history of irrigation shows that the public interest has been too frequently ignored. The subsequent appropriator has rights as well as the prior appropriator, though they are inferior to those of the one prior in time. They need protection nevertheless. In this State it is understood that two things are essential to this end: first, the limitation of appropriation to actual need for beneficial use; and second, public control.

The idea of prior appropriation, and that he who is first in time is first in right, is not inconsistent with public ownership and control. Although the waters were upon the public domain, they must be appropriated, transferred, and used, according to the laws of the State through which the stream flows, from the fact that the United States has only the rights of a proprietor over the lands and waters. (Kinney on Irrigation, 145.) An appropriator acquires a

certain right which is a vested one in the sense that he is entitled to the enjoyment thereof, but such right was not so fixed and determined that it was freed from all subsequent inquiry, as to its extent or its interference with the rights of the public, or other private rights.

It is not a question so very vital whether the title to the waters were transferred to the State by the act of admission.    But the fact that the act accepted, ratified, and confirmed the constitution would be a sufficient grant, at least by way of estoppel, unless the contrary should positively appear.

The establishment of the board in the constitution is of equal rank with the provision establishing a distribution of powers.    Various boards are frequently created with functions more or less judicial.    The board may properly exercise certain judicial duties.    Neither the constitution nor the statutes contemplate a change in what constitutes an appropriation.

The act was not void as containing more than one subject.    (*In re* Fourth Jud. Dist., 4 Wyo., 133.)    The appropriator acquires a right, but not title by his diversion of the water.    His title has not become fixed by his own act.    He must avail himself of the means provided by the law to gain such a title.    The right is merely inchoate until it has been examined by some authority, authorized to consider also the rights of the public, and of other appropriators, and to determine the extent and time of the actual appropriation.    To hold the claim to be vested so as not to be subject to supervision upon the mere *ex parte* statements of the claimant would be practically to make of the first appropriator an overlord of all rights on the stream.

Counsel's interpretation of the police power is too narrow.    What can be more provocative of a conflict of rights, or bad manners and bad neighborhood, than unsettled and conflicting claims to water?

A reasonable opportunity was given the plaintiff to be heard and there arises no question of due process of law.

*J. A. VanOrsdel*, Attorney General, *amicus Curiæ*.

With the adoption of the constitution and the enact-

ment of the law of 1890–91, the district court no longer possessed original jurisdiction for the adjudication of water rights. That jurisdiction was transferred to the board of control. Plaintiff has slept on his rights. He did not apply to the court under the former law when the court was authorized to pass on them, and failed to present his claims to the board, although he was notified of the proceedings.

The waters of the streams are owned and held by the State for the benefit of its citizens. The rights of the first appropriator are no greater than those of the last except in the point of time. It is the duty of the State to protect all. The argument of the counsel for plaintiff proceeds upon a false basis. He assumes that the plaintiff had an absolute and completed right, when, in fact, he had only a claim to a right. One can not acquire a vested right to the use of water by making a mere claim to it, regardless of local requirements, laws, and usages. The contention that he can, is not justified by the statutes or decisions of courts.

It was intended by the framers of the constitution that separate boards should exercise original powers over special matters, such as State lands, State waters, live stock, and assessment of railroad property. They are clothed with the power to exercise judicial discretion and judgment. The constitution merely declared the scope of the powers, leaving the Legislature to provide the plan for the exercise of them. It is difficult to conceive how the board of control could properly perform the constitutional duty imposed upon them of controlling or supervising the appropriation of, distribution of, and diversion of the waters of the State, without exercising judicial functions. The constitution provides that the decisions of the board shall be subject to review by the courts, thus indicating clearly that it was expected they would render decisions. The board is a tribunal possessing original authority and jurisdiction with limited judicial powers as to the waters of the State, and the rights of the parties thereto. (State v. Board Land Com'rs, 7 Wyo., 478; Johnston v. L. H. C. I. Co., 4 id., 126; State v. Foote, id., 132.)

There is but one general subject in the act; viz., the supervision of water. The same is not obnoxious to the constitution as to a duplicity of subjects. The notice provided by law is sufficient.

By the acceptance and ratification of the constitution by Congress, all declarations of right, and title by the State, contained in the instrument were ratified and by such ratification became vested in the State, and a part of the fundamental law of this State.

POTTER, CHIEF JUSTICE.

This suit was instituted in the district court of Johnson County for the purpose of securing a decree quieting the title of plaintiff to the right to use water from French Creek, for the irrigation of certain lands, as against each and all of the defendants, who, it is alleged, are asserting prior and superior rights to the plaintiff.

An appropriation by plaintiff's grantor in the year 1879, and the continued use and application of the water so appropriated, is set out, and in consequence thereof, a right superior to the defendants is alleged to reside in the plaintiff.

The answer of but one of the defendants is in the record. Admitting the original appropriation alleged in the petition, and the ownership of plaintiff to the water right acquired thereby, if any; the answer, by a separate defense, after disclosing the claim of the answering defendant to the use of certain of the waters of the stream for irrigation purposes, by reason of an appropriation in 1883, sets up an adjudication by the State Board of Control of the rights of the various claimants to the use of the water of said stream, on or about October, 1893, in accordance with the provisions of Chapter 8 of the Laws 1890–91, the same being an act entitled, "An Act providing for the supervision and use of the waters of the State." It is alleged that all the notices required by said act were duly given and published, and that the plaintiff had actual notice, and that the proceedings were conducted in accordance with the statutory provisions; and that

neither the plaintiff nor his grantors appeared, or submitted any proof of their alleged rights. It is also alleged that by the order of the said board in that proceeding the defendant was awarded a certain priority for a definite quantity of water, for which a certificate was issued to him, and that "no amount of water whatever was awarded or decreed to the plaintiff or to any other person for use upon the lands described in said plaintiff's petition." Wherefore, it is averred that the plaintiff has abandoned its rights, and is now estopped from asserting the same. To this defense plaintiff filed a general demurrer, upon the consideration of which the district court ordered that the following questions, being deemed difficult and important, be reserved for the decision of this court:

"First: Is the Board of Control of the State of Wyoming, provided for by Article 8, Sec. 2, of the constitution of Wyoming, vested with judicial power in such manner that it may adjudicate and determine the rights of priority among claimants to the use of water for beneficial uses, from the public streams of this State?

"Second: Is Chapter 8 of the laws of Wyoming of 1890–1891, the same being an act entitled 'An act providing for the supervision and use of the waters of the State,' or the sections of said chapter which authorize the Board of Control to adjudicate water rights, and providing a system of procedure therefor, constitutional?

"Third: If the Board of Control be a legal tribunal for the adjudication of water rights, and the act in question constitutional, are such provisions retroactive, and are claimants of prior rights to the use of water, which were acquired prior to the adoption of the constitution and passage of the acts in question, required to submit their rights to the adjudication of said Board?

"Fourth: In case claimants of water rights, which accrued, as stated in the petition herein, before the adoption of the constitution, do not submit their rights to said Board for adjudication, when proceedings are had under the provisions of the act by the Board of Control for the

adjudication of the rights of the stream out of which said claimants take their water, are they then concluded or estopped by such adjudication?

"Fifth: Do the provisions of the statute providing for publication of notice, and notice by mail, and without actual citation or service of summons, constitute due process of law whereby the titles of persons to water rights for beneficial uses may be determined?

"Sixth: Does the answer or defense to which the demurrer was interposed, constitute a sufficient answer or defense to plaintiff's complaint, under the law?".

In this State, the doctrine prevails that a right to the use of water may be acquired by priority of appropriation for beneficial purpose, in contravention to the common law rule that every riparian owner is entitled to the continued natural flow of the waters of the stream running through or adjacent to his lands. The appropriation consists in a diversion of the water by some adequate means, and its application to a beneficial use. Moyer v. Preston, 6 Wyo., 308.

It is doubtful if any questions of graver importance than those affecting water rights are presented for judicial consideration. Notwithstanding the settlement of the fundamental doctrine and its recognition by our constitution and statutes, the law respecting it in many of its phases may be said to be still in course of development, and compared with other questions which are likely to arise relating to this general subject, it is probable that none will exceed in importance, those involved and submitted for determination in this controversy. They strike at the root of the system adopted in this State for the supervision and distribution of the appropriated waters.

As introductory to the discussion of the reserved questions, we will undertake a very brief survey of the leading features of local legislation and conditions existing anterior to the framing and adoption of the constitution and the enactment of the statute, out of which the contentions in the case at the bar arise.

Legislative attention was first directed to this subject in 1875. The act of that year declared that those having a possessory right or title to land "on the bank, margin, or neighborhood of any stream" should be entitled to the use of the water thereof for the purpose of irrigation, and to a right of way over the lands of others for the construction of irrigating ditches. Provision was also made for the just and equitable allotment of water in times of scarcity through the agency of commissioners who, when appointed and required to act, were to make the apportionment for the interest of all parties concerned, and with due regard to the legal rights of all.

At the time of the passage of the act of 1875, the territory was very sparsely settled, and comparatively but little had been accomplished toward the cultivation of the soil. It is a fact nevertheless that from the earliest settlement of the territory, irrigation, although in a limited degree, had been practiced by means of the diversion of the water of natural streams, and land had thereby been brought under successful cultivation; and in certain portions of the territory, water rights had been acquired for the purpose of mining, and possibly in aid of other industries.

It is safe to say, however, that while irrigation had been resorted to sufficiently to demand legislative recognition as early as 1875, and the right to appropriate water for beneficial uses had been from the beginning continually asserted and recognized by prevailing custom and usage, it had not then attained such proportions as to exact much public interference or regulation.

With the increasing settlement of the public lands, and the impetus furnished to their reclamation through the enactment by Congress in 1877 of the Desert Land Act, water appropriations and irrigation works were rapidly augmented in number and value, until in 1886, many valuable water rights had been acquired, and title to considerable public land had been secured by patent from the general government in consequence of such settlement

and reclamation. The settlement of the public lands with but few exceptions, if any, although the entry may have been made under the homestead or pre-emption laws was expedited, if indeed it was not solely rendered possible, by the facilities afforded by nature, the customs and laws for the irrigation thereof. Thus the cultivation and even the occupation of the lands within the territory had been attended with the expenditure of much capital and labor, and the very existence of the homes of a large class of citizens, as well as the productiveness of the soil, depended upon the security to be afforded the appropriations of water which had been made; and in view of the many rights already accrued, and the inception of new ones which would necessarily accompany the continued growth of the territory, the welfare of the entire people became deeply concerned in a wise, economical and orderly regulation of the use of the waters of the public streams.

It was realized that more adequate laws were demanded to duly protect this important industrial interest, give stability to its values, assist in a desirable conservation of the waters, and avoid confusion and difficulty in their distribution. A striking advance along these lines was made by an act of the territorial Legislature of 1886, although the imperfections of that law soon asserted themselves.

It is no part of our purpose to dwell in detail upon the provisions of .that act, for they do not concern the present inquiry except in so far as together with other legislation, they tend to illustrate the development of our existing system, and the influences which led to the constitutional expressions, and the inauguration of the scheme incorporated in the act of 1890–91.

Succinctly stated, the act of 1886 embraced a declaration that the water of every natural stream was the property of the public and dedicated to the use of the people, subject to appropriation; the division of the territory into irrigation districts, not as public corporations, but as including specified territory, within each of which

districts a water commissioner was to be appointed with general authority to divide the water in the streams in his district among the several ditches according to their respective prior rights; the creation of a special proceeding for the adjudication of the 'priorities of rights upon the same stream within the same district, in the particular district court vested by the act with jurisdiction therein — the districts within the jurisdiction of each district court being designated; and a provision requiring every claimant to a water right to file a statement of claim thereof under oath, with the county clerk and clerk of court, on or before Sept. 1, 1886, and every subsequent claimant to so file a similar claim before commencing the construction of his diverting works. See Rev. Stat., 1887, Sections 1331–1361.

The special proceeding for adjudication was purely statutory and the only reason for its creation is to be found in the inability of the ordinary procedure and processes of the law to meet the necessities pertaining to the seggregation by various individuals or companies of water from the same stream, by separate ditches or canals, and at different points along its course, under rights by appropriation to so divert and use the water. A similar proceeding in Colorado has been held to be based upon or to grow out of the police power of the State. Farmers Ind. Ditch Co. v. Agr. Ditch Co., 22 Colo., 513; White v. Highline Canal Co., id., 191; see also Louden Canal Co. v. Handy Ditch Co., id. 102, 110.

The persons instituting the proceeding were not required to allege any injury to them or their property, nor any facts necessary to constitute a cause of action at law, or ground for relief in equity. The purpose of the adjudication was a decree settling the various priorities of right from the same stream, and the issuance thereunder of a certificate to each appropriator represented, showing his relative priority and the quantity of water to which he should be found entitled. The decree could be reopened at any time within two years, and could be reviewed

with or without reargument, or additional evidence, and an appeal could be taken to the supreme court. The proceedings were largely informal, and it was permitted the court or judge to appoint a referee to take the testimony.

The same Legislature provided, by another act, for an official survey of the several ditches, or canals, connected with the appropriation of water by county surveyors, at the expense of the owners. The certificate of the surveyor showing the result of the survey was required to be filed with the proper clerk of court. Rev. Stat. 1887, Sections 1362–1365.

It is known that a few adjudications, but not many, occurred under proceedings afforded by the act of 1886. In 1888, the office of territorial engineer was created with general power of supervision of the diversion and division of the public waters, and of the work of the water commissioners. It was exacted of that officer that he measure and ascertain the carrying capacity of any ditch at the request of an interested party, and furnish a certificate thereof; and to measure and calculate the flow of the waters of each stream drawn upon for irrigation purposes. He was further required to collect facts and make reports as to a system of reservoirs; become conversant with the waterways of the territory, and to suggest from time to time the amendment of existing or enactment of new laws as his information and experience should suggest. A copy of all decrees in the special proceedings, under the law of 1886, was required to be forwarded to the engineer, recorded in his office, and the particulars thereof furnished the appropriate commissioner. (L. 1888, Ch. 55.)

The act of 1888 also declared the waters of the natural streams to be public, and dedicated to the people, subject to appropriation, and made new regulations — largely a repetition of the former — as to the recording of claims, but discarded the office of clerk of court as a place for such record. Another act of the same assembly repealed the provisions relating to a survey of ditches by county surveyors.

We might be justified in adverting to other interesting particulars of the laws of 1886 and 1888; but we apprehend that sufficient reference to those laws has been made to show the conditions existing when the constitution was adopted, and to illustrate what we conceive to be the fact, that in the progress of our legislation in respect to the use of water for irrigation and other beneficial purposes, the significant feature of the changes and additions from time to time has been the principle of centralized public control and regulation. One can hardly fail to be impressed with the gradual tendency exhibited in the various acts toward the greater effectiveness of public supervision.

The expressions of the constitution relating to irrigation and water rights are as follows:

"Water being essential to industrial prosperity, of limited amount and easy of diversion from its natural channels, its control must be in the State, which, in providing for its use, shall equally guard all the various interests involved." Art. 1, Sec. 31.

"The water of all natural streams, springs, lakes, or other collections of still water, within the boundaries of the State, are hereby declared to be the property of the State." Art. 8, Sec. 1.

"There shall be constituted a Board of Control to be composed of the State engineer and superintendents of the water divisions; which shall, under such regulations as may be prescribed by law, have the supervision of the waters of the State, and of their appropriation, distribution, and diversion, and of the various officers connected therewith. Its decisions to be subject to review by the courts of the State." Id., Sec. 2.

"Priority of appropriation for beneficial uses shall give the better right. No appropriation shall be denied except when such denial is demanded by the public interests." Id., Sec. 3.

"The Legislature shall by law divide the State into four (4) water divisions, and provide for the appointment of superintendents thereof." Id., Sec. 4.

"There shall be a State engineer who shall be appointed by the governor of the State and confirmed by the senate; he shall hold his office for the term of six (6) years, or until his successor shall have been appointed and shall have qualified. He shall be president of the Board of Control, and shall have general supervision of the waters of the State and of the officers connected with its distribution. No person shall be appointed to this position who has not such theoretical knowledge and such practical experience and skill as shall fit him for the position." Id., Sec. 5.

Pursuant to the constitutional requirements, the first State Legislature by an act entitled, "An act providing for the supervision and use of the waters of the State," approved Dec. 22, 1890, created the State Board of Control, divided the State into four water divisions, and provided for the appointment of a superintendent for each division. The office of water commissioner is retained, who becomes the local official charged with the duty of dividing the waters in his district among the several claimants, according to their respective priority of rights, under the general supervision of the board, superintendents, and State engineer. Water districts are required to be established by the Board of Control as priorities of appropriation are adjudicated.

The duty was devolved upon the various county clerks to transmit to the State engineer within thirty days a transcript of all claims to appropriations of water on file in their respective offices; and where an original record thereof was contained in books kept for that purpose, the original records of claims were to be transmitted instead of an abstract. The clerks of court were likewise required to forward to the engineer the certificates of county surveyors on file in their respective offices, showing the measurements of ditches. Thereafter before any person shall commence the construction, enlargement, or extension of any distributing works, or performing any work in connection with an intent to appropriate any of the

public waters of the State, it was and is exacted of him that he apply to the president of the Board of Control for a permit to make such appropriation. Complete regulations controlling the action of the engineer in approving or rejecting the application, are embraced in the act, including provisions for an appeal from the action of the engineer in rejecting an application to the board, and from the order of the board thereon to the district court.

By the act in question also, a system of procedure to be inaugurated and conducted by the board is established, wherein and whereby the board is directed and empowered to ascertain, adjudicate, and determine the priorities of rights of the various claimants from the same stream, and the former legislation authorizing such adjudication by a special proceeding in the district court is repealed. It was provided, however, that all cases in such special proceedings then pending in the courts might be retained therein and proceed to final determination, in accordance with the laws in force at the time of their inception; or that such cases, or any of them, might be transferred, on the application of the interested parties, to the Board of Control.

The jurisdiction and authority of the Board of Control to make the determination as required by the act, and the power of the Legislature to confer that authority upon the board, is contested in the case at bar, and the several questions reserved for the decision of this court, depend for their solution upon a consideration of the validity and effect of that portion of the act making provision for the adjudication.

The act of Dec. 22, 1890, is, as amended in some particulars, immaterial to the present inquiry, contained in the Revised Statutes of 1899, and in Sections 859 to 887, inclusive. Sections 859 and 860 are as follows:

"Sec. 859. It shall be the duty of the board, at its first meeting, to make proper arrangements for beginning the determination of the priorities of right to the use of the public waters of the State, which determination shall

begin on the streams most used for irrigation, and be continued as rapidly as practicable, until all the claims for appropriation now on record, shall have been adjudicated.''

"Sec. 860. The Board of Control shall decide at their first meeting the streams to be first adjudicated, and shall fix a time for beginning of taking of testimony and the making of such examination as will enable them to determine the rights of the various claimants.''

Concerning the proceedings preliminary to an order of determination, it will sufficiently answer our purpose to state that notices are required to be published, and sent by registered mail to each person having a recorded claim to waters of the stream or streams embraced in the adjudication proceedings, showing when the engineer will begin a measurement of the stream and the several diverting works, and the time and place when the superintendent will commence the taking of testimony. Accompanying the notice there is required to be sent to the claimant a blank form on which the claimant is required to present in writing, under oath, certain specified facts relating to his appropriation. Upon the completion of the testimony the same is to be opened to public inspection at a time and place mentioned in a notice thereof to be previously published and sent by mail to the several claimants.

An opportunity is provided for any interested party to contest before the superintendent and the board the claim of any other persons who may have submitted their proof. Upon the completion of the evidence in the original hearing, and in all contests, the same is required to be transmitted to the Board of Control. In the meantime the engineer or his assistant is required to make an examination and measurement of the stream, and the works diverting water therefrom, as well as of the irrigated lands, or lands susceptible of irrigation from the various ditches or canals taking water from the stream then under consideration; and to make a map or plat showing the course of the stream, the location of each ditch, and the lands irrigated or susceptible of irrigation therefrom. Sections 872 and 873 are as follows: —

"Sec. 872. At the first regular meeting of the Board of Control, after the completion of such measurement by the State engineer, and the return of said evidence by said division superintendent, it shall be the duty of the Board of Control to make, and cause to be entered of record in its office, an order determining and establishing the several priorities of right to the use of waters of said stream, and the amounts of appropriations of the several persons claiming water from such stream, and the character and kind of use for which said appropriation shall be found to have been made. Each appropriation shall be determined in its priority and amount, by the time by which it shall have been made and the amount of water which shall have been applied for beneficial purposes. *Provided*, That such appropriator shall at no time be entitled to the use of more water than he can make a beneficial application of on the lands for the benefit of which the appropriation may have been secured, and the amount of any appropriation made by reason of an enlargement of distributing works, shall be determined in like manner. *Provided*, That no allotment shall exceed one cubic foot per second for each seventy acres of land for which said appropriation shall be made."

"Sec. 873. As soon as practicable after the determination of the priorities of appropriation of the use of waters of any stream, it shall be the duty of the secretary to issue to each person, association, or corporation represented in such determination, a certificate to be signed by the State engineer, as president of the Board of Control, and attested under seal by the secretary of said board, setting forth the name and postoffice address of the appropriator; the priority number of such appropriations; the amount of water appropriated; and if such appropriation be for irrigation, a description of the legal subdivisions of land to which said water is to be applied. Such certificate shall be transmitted by said State engineer, or by a member of the Board of Control in person, or by registered mail, to the county clerk of the county in which

such appropriation shall have been made, and it shall be
the duty of the county clerk upon the receipt of the
recording fee, which fee shall be seventy-five cents, to
record the same in a book specially prepared and kept
for that purpose, and thereupon immediately transmit the
same to the respective appropriators.    Said recording fee
of seventy-five cents shall be paid to the division superin-
tendent, at the time of the submission of testimony and
proof of appropriation of water by each such appropria-
tor or claimant before the said division superintendent, as
provided by law, and shall be by him, or the State engi-
neer, transmitted with each certificate of appropriation
to the county clerk of the county in which said certificate
is to be recorded and his receipt taken therefor, which
said receipt shall be filed in the State engineer's office.''

Provision is made for an appeal, by any party feeling
himself aggrieved, from the decision of the board to the
district court, and from that court to the supreme court.

Counsel for the plaintiff contend that the act of Decem-
ber 22, 1890, is unconstitutional, in so far as it confers
upon the Board of Control authority to determine the
priorities of rights to the use of water.    Several reasons
are urged in support of such contention.    In the first
place it is insisted that the act is in conflict with Section
24, of Article 3 of the constitution, which provides that,
''No bill, except general appropriation bills, and bills for
the codification and general revision of the laws, shall be
passed containing more than one subject, which shall be
clearly expressed in its title; but if any subject is em-
braced in the act which is not expressed in the title, such
act shall be void only as to so much thereof as shall not
be so expressed.''

It is argued that the provisions for adjudication of
water rights are not included in the word '' supervision,''
employed in the title, and that in this respect the act is
broader than the title, and contains more than one subject.
The general principles which should control in a question
of this kind are laid down in the case of *In re* Fourth

Judicial District, 4 Wyo., 133, where the whole subject is elaborately discussed. It was there said that, "It is not essential that the title shall specify particularly each and every subdivision of the general subject." If but one general and comprehensive subject is contained in the act, and all the provisions are germane to that subject, then the act can not be said to violate either the spirit or letter of the constitutional provision referred to. The title of an act in Colorado was, "An act to regulate the use of water for irrigation, and providing for settling the priority of right thereto, and for payment of the expenses thereof, and for payment of all costs and expenses incident to said regulation and use." Certain provisions of the act relating to the establishment of maximum rates to be charged by carriers of water, were assailed as void, upon the ground that the title contained more than one subject, and the matter of fixing rates was not clearly referred to therein. The court in discussing the title said, "In our judgment the same must have been sufficient had it read, 'An act to regulate the use of water for irrigation.' This is the controlling purpose of the law; the rest of the title refers to nothing not germane to the subject thus expressed. Incidental to a proper regulation of the use of water diverted from natural streams in this State is a determination of the priority of rights in connection therewith." * * * "And it requires no argument to demonstrate that a general law intended to fully regulate the use of such water, would almost of necessity touch upon the subject of priority of right thereto." Golden Canal Co. v. Bright, 8 Colo., 144.

We think it is not to be reasonably doubted that the one general subject of the act was the supervision of the waters of the State. And we are clearly of the opinion that the matter of determination of the priorities of rights to such waters, is a part of the general subject and germane to it.

Another ground urged against the validity of the act, is that judicial power is attempted to be conferred upon

the Board of Control, in violation of Section 1, of Article 2, of the constitution, dividing the State Government into three distinct departments, and of Section 1, of Article 5, vesting the judicial power in certain specified courts. This raises a question of vital importance; especially when we consider that during the nine years intervening since the creation of the board, it has proceeded in pursuance of the statute, to determine the priorities of claimants upon numerous streams, and that its certificates issued therein constitute the evidence of title to a large number of water rights. That fact is not to preclude a careful investigation of the serious question presented, nor to control in its disposition, except possibly in so far as it is entitled to weight as showing the construction of the law on the part of the administrative or executive department, and further, perhaps, in connection with the elementary principle that a statute is to receive every presumption in favor of its validity, and is not to be overthrown by the courts unless it is clearly unconstitutional.

The provisions of the constitution now invoked in opposition to the statute are as follows: "The powers of the government of this State are divided into three distinct departments: the legislative, executive, and judicial, and no person or collection of persons, charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted." (Art. 2, Sec. 1.)

"The judicial powers of the State shall be vested in the senate, sitting as a court of impeachment, in a supreme court, district court, justices of the peace, courts of arbitration, and such courts as the Legislature may by general law establish for incorporated cities or incorporated towns." (Art. 5, Sec. 1.)

The position maintained by counsel is that a determination of the priorities of rights to the use of water involves solely a judicial inquiry into rights to property as between

private parties; and that the jurisdiction to undertake such an investigation and adjudicate therein can be constitutionally lodged only in some court which is by Article 5 of the constitution vested with judicial power.

The statute nowhere attempts to divest the courts of any jurisdiction granted to them by the constitution to redress grievances and afford relief at law or in equity under the ordinary and well-known rules of procedure. A purely statutory proceeding is created to be set in motion by no act or complaint of any injured party, but which in each instance is to be inaugurated by order of the board; a proceeding which is to result not in a judgment for damages to a party for injuries sustained, nor the issuance of any writ or process known to the law for the purpose of preventing the unlawful invasion of a party's rights or privileges; but the finality of the proceeding is a settlement or adjustment of the priorities of appropriation of the public waters of the State, and is followed by the issuance of a certificate to each appropriator showing his relative standing among other claimants, and the amount of water to which he is found to be entitled.

At the outset, however, it is strenuously insisted that the declaration contained in the constitution that the waters of the natural streams, etc., are the property of the State, is meaningless and of no force or effect. It is argued that the State no more than an individual can acquire property by a mere assertion of ownership; and that the United States as the primary owner of the soil is also primarily possessed of title to the waters of the streams flowing across the public lands. This contention demands more than a passing notice.

So far as any proprietary rights of the United States are concerned, the question would seem to be settled in favor of the effectiveness of the declaration, by the act of admission, which embraces the following provision: "And that the constitution which the people of Wyoming have formed for themselves, be, and the same is hereby, accepted, ratified, and confirmed." McCornick v. Western

Union Tel. Co., 79 Fed., 449.    In that case the circuit court of appeals for the 8th circuit of the United States, held that under a similar provision in the act of Congress, admitting Utah, all the provisions of the Utah constitution were invested with all authority conferred by any act of Congress.

But is there not a further and deeper reason for upholding the validity and force of the constitutional declaration ?    Under the doctrine of prior appropriation, it would seem essential that the property in waters affected by that doctrine should reside in the public, rather than constitute an incident to the ownership of the adjacent lands.    Such waters are, we think, generally regarded as public in character.

By the civil law the waters of all natural streams were *publici juris*, and according to Bracton that was the rule anciently in England.    Kinney on Irr., Sec. 53; Gould on Waters, Sec. 6.    At the modern common law public waters are generally confined to those which are navigable, and public rights therein to navigation and fishery, and privileges incident thereto.    In the arid region of this country another public use has been recognized by custom and laws and sanctioned by the courts; a public use sufficient to support the exercise of the power of eminent domain.    Fallbrook Irr. Dist. v. Bradley, 164 U. S., 112, 160.    This use, and the doctrine supporting it, is founded upon the necessities growing out of natural conditions, and is absolutely essential to the development of the material resources of the country.    Any other rule would offer an effectual obstacle to the settlement and growth of this region, and render the lands incapable of continued successful cultivation.    The waters for the reclamation of the desert lands must be obtained, in a very large measure, from the natural streams and other natural bodies of water.

The common law doctrine of riparian rights relating to the use of the water of natural streams and other natural bodies of water not prevailing, but the opposite

thereof, and one inconsistent therewith, having been affirmed and asserted by custom, laws, and decisions of courts, and the rule adopted permitting the acquisition of rights by appropriation, the waters affected thereby become perforce *publici juris*. It is therefore doubtful whether an express constitutional or statutory declaration is required in the first place to render them public. In a country where the doctrine of prior appropriation has at all times been recognized and maintained, an expression by constitution or statute that the waters subject to appropriation are public, or the property of the public, would seem rather to declare and confirm a principle already existing, than to announce a new one. But, however this may be, we entertain no doubt of the power of the people in their organic law, when existing vested rights are not unconstitutionally interfered with, to declare the waters of all natural streams, and other natural bodies of water, to be the property of the public, or of the State. Nor do we doubt that the Legislature may make a like declaration, when, in that particular, unrestrained by the constitution.

If any consent of the general government was primarily requisite to the inception of the rule of prior appropriation, that consent is to be found in several enactments by Congress, beginning with the act of July 26, 1866, and including the Desert Land Act of March 3, 1877. Those acts have been too often quoted and are too well understood to require a restatement at this time at the expense of unduly extending this opinion.

It has been held that the act of July 26, 1866, was rather a voluntary recognition by Congress of pre-existing rights, constituting valid claims to a continued use, than the establishment of new rights. Brodie v. Water Co., 101 U. S., 274.

By these various acts, "the obvious purpose of Congress was to give its assent, so far as the public lands were concerned, to any system, although in contravention to the common law, which permitted the appropriation of

these waters for legitimate industries," and, "a State may change the common law rule, and permit the appropriation of the flowing waters for such purposes as it deems best." U. S. v. Rio Grande Irr. Co., 174 U. S. 690.

If, as has been said, the title of the general government to the public lands is that of proprietor rather than sovereign (Kinney on Irr., Sec. 145), it would seem that its rights as such are not greater to the waters of the streams flowing across the lands than those of an individual owner.

In Arizona and Nevada, the statutes declare the ownership of the public in the waters of the natural streams. Clough v. Wing, 17 Pac., 453; Kinney on Irr., Sec. 407.

The effect of such a declaration has been determined by the courts of Colorado, whose constitution declares that the unappropriated waters of the streams within the State are the property of the public. In the case of Wheeler v. Northern Colo., I. Co., 10 Colo., 582, Mr. Justice Helm, in delivering the opinion of the court, said, " Our constitution dedicates all unappropriated water in the natural streams of the State to the use of the people, the ownership thereof being vested in the public. We shall presently see that after appropriation, the title to this water, save perhaps as to the limited quantity that may be actually flowing in the consumer's ditch or lateral, remains in the general public, while the paramount right to its use, unless forfeited, continues in the appropriator."

Again, in Fort Morgan L. & C. Co. v. So. Platte Ditch Co., 18 Colo., 1, in the opinion delivered by Mr. Chief Justice Hayt, it is said, " Under our constitution, the water of every natural stream in this State is deemed to be the property of the public. Private ownership of water in the natural streams is not recognized. The right to divert water therefrom and apply the same to beneficial uses is, however, expressly guaranteed. By such diversion and use a priority of right to the use of water may be acquired."

There is to be observed no appreciable distinction, under the doctrine of prior appropriation, between a dec-

laration that the water is the property of the public, and that it is the property of the State.

It is said in Mc Cready v. Virginia, 94 U. S., 391, in discussing the subject of tide waters: "In like manner the States own the tide waters themselves. * * * For this purpose, the State represents its people, and the ownership is that of the people in their united sovereignty." See also Martin v. Waddell, 16 Pet., 410 ; Gould on Waters, Sec. 32 ; Kinney on Irrigation, Secs. 51, 53 ; Bell v. Gough, 23 N. J. L., 624. "The Sovereign is trustee for the public." 3 Kent's Com., 427 ; Miller v. Mendenhall (Minn.), 8 L. R. A., 89.

The ownership of the State is for the benefit of the public or the people. By either phrase, "property of the public" or "property of the State," the State, as representative of the public or the people, is vested with jurisdiction and control in its sovereign capacity.

The constitutional declaration was not intended to interfere with previously accrued rights to use the public waters of the State, and it does not conflict with such rights. It was, however, by all the constitutional expressions, undoubtedly intended that such rights, and all appropriations, should be regulated upon the basic principles therein enunciated. That the constitutional provision did not impair rights already accrued, is apparent not only from the accompanying provisions, but from the nature of such rights. Although an appropriator secures a right, which has been held with good reason to amount to a property right, he does not acquire a title to the running waters themselves, except, it may be, to such quantity as shall from time to time have been lawfully diverted, and after diversion may be running in his ditch or lateral. The title of the appropriator fastens not upon the water while flowing along its natural channel, but to the use of a limited amount thereof for beneficial purposes, in pursuance of an appropriation lawfully made and continued. The appropriation is made, in the first place, upon the basis of public ownership of the water, and is protected instead of impaired by the constitutional declaration.

There can hardly be any controversy over the power of the State to regulate prior, as well as subsequent, rights of appropriation. In reference to conflicting deeds to the same tract of land, and the validity of recording acts, it was held in a leading case by the Supreme Court of the United States, that even where a State has originally granted the land to the first individual owner, there is no contract on the part of the State that the priority of title shall depend solely upon the principles of the common law, or that the State shall pass no law imposing on a grantee the performance of acts not necessary to the legal operation of his deed, at the time of its delivery. "It is within the undoubted power of State Legislatures to pass recording acts by which the elder grantee shall be postponed to a younger, if the prior deed is not recorded within the limited time; and the power is the same whether the deed is dated before or after the passage of the recording act." Jackson v. Lamphire, 3 Pet., 280.

All rights acquired by appropriation partake of the same general characteristics, differing essentially only in priority and quantity, and possibly in purpose. Where various rights are connected with the same stream or body of water, a subsequent claim can not be successfully regulated without including, in the regulations, all rights. The water to which the use of each attaches is public, and the people as a whole are intensely interested in its economical, orderly, and inexpensive distribution. It is a matter of public concern that the various diversions shall occur with as little friction as possible, and that there shall be such a reasonable and just use and conservation of the waters as shall redound more greatly to the general welfare, and advance material wealth and prosperity.

In a Colorado case it was said: "From the very nature of the business, controversies with reference to the use of water naturally led to unseeming breaches of the peace, and to avoid these it was found expedient and necessary to provide complete rules of procedure governing the taking of water from the public streams of the State, and

regulating its distribution to those entitled thereto. Authority for such regulations may properly be based upon the principle that when private property is affected by a public interest, it ceases to be *juris privati* only." White v. Highline Ditch Co., 22 Colo., 191.

From any standpoint we think it is clear that the declaration that the waters subject to appropriation for beneficial purposes are the property of the State, is valid and effectual.

The other fundamental principles expressed in the constitution are, that control of the public waters must be in the State, which in providing for their use shall equally guard all the various interests involved. Such control shall consist in a supervision of the waters, their *appropriation, distribution, and diversion* by a Board of Control to be composed of certain designated officers, with an officer of technical and practical knowledge and experience at its head; and priority of appropriation shall give the better right. Let us inquire into the nature and subject of the supervisory power of the board. In the first place, the scheme of State control does not necessarily require the construction, or operation on the part of the public, of irrigating or diverting works; nor is there necessarily involved in that scheme the idea that the State shall become, through its own works, carriers of the water to consumers.

It is evident that it was intended that the supervision by the board should operate upon and in relation to, individual appropriations and diversions; and hence there was contemplated a control and supervision of the diversion by private appropriators, and a distribution to and between them.

It is equally clear that the supervision comprehends official action, administrative rather than judicial in its fundamental character; although as a necessary incident thereto, as will presently be shown, there is involved quasi judicial authority.

It was argued with much force that the word "supervision" employed in the constitution does not, according

to its most extensive definition, include adjudication; wherefore it was contended a power to act judicially and determine the rights of claimants is not conferred by the constitution. The question, however, is broader than that suggested by such an argument. We are to consider whether all the constitutional authority of the board, applied to the peculiar subject matter within its operation, is of such a nature as to authorize the Legislature to confer upon the board jurisdiction to determine the relative rights of the various claimants, as a power necessary to the effectual exercise by the board of its important administrative duties.

It has already been suggested that the supervision of the board affects individual appropriations, and concerns the distribution of water to individual claimants. Any effort to supervise and control the waters of the State, their appropriation and distribution, in the absence of an effective ascertainment of the several priorities of rights, must result in practical failure, in times when official intervention is most required. In fact, that had been demonstrated under our former system.

In the development of the irrigation problem, under the rule of prior appropriation, perplexing questions are continually arising of a technical and practical character. As between an investigation in the courts, and by the board, it would seem that an administrative board, with experience and peculiar knowledge along this particular line can, in the first instance, solve the questions involved with due regard to private and public interests, conduct the requisite investigation, and make the ascertainment of individual rights, with greater facility, at less expense to interested parties, and with a larger degree of satisfaction to all concerned. In the opinion of an able law writer upon this subject, the powers of the Board of Control in this respect constitute one of the most praiseworthy features of our legislation. He says: "In the State of Wyoming, at least, there will no longer be the ludicrous spectacle of learned judges solemnly decreeing the right

to from two to ten times the amount of water flowing in a stream, or in fact amounts so great that the channel of the stream could not possibly carry them, thus practically leaving the questions at stake as unsettled as before.'' Kinney on Irr., Sec. 493.

The board is not required to await the occurrence of controversies, but is to proceed on its own motion to ascertain the various rights, conflicting or not, and thereupon see that the water is properly divided. The supervision of the board affects the water of natural streams, the title to which while flowing in its accustomed channels remains in the State or public, and of such a peculiar character that public control is demanded to insure its orderly, economical, and fair distribution.

The determination required to be made by the board is, in our opinion, primarily administrative rather than judicial in character. The proceeding is one in which a claimant does not obtain redress for an injury, but secures evidence of title to a valuable right — a right to use a peculiar public commodity. That evidence of title comes properly from an administrative board which, for the State in its sovereign capacity, represents the public, and is charged with the duty of conserving public as well as private interests. The board, it is true, acts judicially, but the power exercised is quasi judicial only, and such as under proper circumstances may appropriately be conferred upon executive officers or boards.

The jurisdiction bears some resemblance to that of the land department of the government concerning the disposal of the public lands. That department is not regarded as a court, or as a branch of the judicial department; nor is its jurisdiction upheld upon the basis of any authority residing in Congress to establish courts. It is considered as an administrative department, and its powers are held to be quasi judicial only. Orchard v. Alexander, 157 U. S., 372.

There exists the same partial resemblance to the State board of land commissioners of our own State. State *ex*

*rel.*, Marsh v. Board of Land Commissioners, 53 Pac., 292; 7 Wyo., 478.

We are not persuaded that the act is void as conferring judicial power upon the board in violation of the constitution.

That the board was expected to exercise quasi judicial functions is apparent from that provision of Section 2, of Article 8 of the constitution, requiring its decisions to be subject to review by the courts. An examination of the proceedings and debates of the constitutional convention convincingly discloses that the precise method and system adopted by the statute was within the purpose of the convention.

The committee on irrigation, in reporting the provisions upon the subject of water, its use and control, had before it and caused to be read to the convention a paper, prepared by the territorial engineer showing the evils of the system of regulation then existing, and suggesting certain principles to be embodied in the constitution, and to control future legislation. The representative of the committee on the floor of the convention stated that the system reported by the committee was the opposite of the one then in force; and that the elemental error in the former system consisted in submitting to the courts a matter about which they had little official or practical knowledge. The paper of the engineer enlarged upon the same proposition, and outlined a method of public supervision including a determination of rights practically the same followed by the existing statute. The president of the convention, a lawyer of much ability and experience, said in the course of the discussion, "Leave it to the Board of Control to say what equities enter into this matter of the use of water, and let them consider every question that arises in connection with its appropriation, and then say, under all the equities of the case, who shall be entitled to the use of that water." And again, "When we appoint a Board of Control to manage this water system that we say belongs to the State, let us give

them authority to control it for the highest and best uses of the people of the State.'' Const. Debates, p. 503.

The third reserved question inquires whether claimants whose rights had accrued anterior to the constitution and the enactment of the present statute are required to submit proofs of their rights in the adjudication proceedings; and the fourth question relates to the effect of a failure on the part of such a claimant to submit his proofs.

It follows from what has already been said, that in this regard there exists no difference between claimants whose rights accrued prior and those acquiring rights after the adoption of the constitution and the statute in question. The statute itself, in that respect, makes no distinction between claimants. The same duty to submit proofs is imposed alike upon all who claim a right to the use of water by priority of appropriation.

It is certainly a mistaken notion that the Legislature is powerless to require an owner of a property right, however long that ownership may have subsisted, to submit his claims to a legal tribunal, in an authorized proceeding, upon due and proper notice for determination as between him and others claiming interests in the same subject matter. When the subject of the right is water, and the right is confined to its use, the water itself belonging to the public which assumes to control its appropriation and distribution, the Legislature may, undoubtedly, require all parties to submit their claims for determination, that the evidence of the right may consist in the decision of a legally constituted tribunal, instead of the assertion of the individual consumer, so far as the public records are concerned, and that the interests of the public and all interested parties may be protected.

With any jurisdiction to determine the rights of claimants to the use of the public waters, the board would be greatly hampered in its supervision if the jurisdiction did not extend to and cover all claims independently of the date of their inception. The supervisory power of the board unquestionably embraces all public waters as well

as all appropriations thereof, and the distribution and diversion of all such waters. The legislative power of regulation must be, and is, equally as comprehensive. If as necessary to the complete and ample supervision of the matters within the operation of the board's authority, a power of adjudication is essential, appropriate, and valid, such a power, conferred without restriction as to claimants, must be held to be co-extensive with the supervisory control of which it is an incident. We are therefore of the opinion that all claimants are required to appear and submit their proofs.

The effect of a failure upon due notice of any party to do so presents in the present condition of the statute a more intricate question.

It is to be observed that the statute imposes no express penalty upon a claimant in case of his neglect or refusal to give evidence of his appropriation. Neither is there any express limitation, in such cases, upon a further assertion of rights by legal proceedings, or in some manner, if any, authorized by law. Doubtless reasonable penalties may be imposed, or limitations even rigorous in terms placed upon a subsequent assertion of such rights, in the event of a disregard by a party of the reasonable requirement that he appear and submit proof of his claim. It is significant, however, that no such penalty or limitation is contained in the statutory provisions.

It is perhaps true that as an implied penalty a claimant remaining unrepresented in the proceeding and determination may be without standing in a subsequent division of the waters under a decree of adjudication, by the water commissioner. But nowhere is it provided that a claimant failing to appear shall be barred or estopped from subsequently maintaining or asserting his claim. Possibly the provision for a rehearing in the proceedings before the board may be susceptible to the construction that one not originally heard may apply for rehearing within the limited period of one year; but even then should such an one not take advantage of that privilege, no penalty seems to be imposed.

Independent of penalty or limitation, it is clear that the claimant would not be estopped or barred unless upon the principle of *res judicata*. It may be assumed that, in the absence of fraud or collusion, any matter actually and legally determined by the final decree of the board becomes *res judicata*, at least as to the public, and the parties participating in the proceedings. See Louden Irr. Canal Co. v. Handy Ditch Co., 22 Colo., 102; Boulder and Weld County Ditch Co. v. Lower Boulder Ditch Co., id. 115; Colo. M. & E. Co. v. Larimer & W. Irr. Co. (Colo.), 56 Pac., 185.

We are led to inquire, therefore, in this connection, whether the rights attempted to be enforced by the plaintiff entered into the determination of the board and thereby became finally disposed of under the operation of the doctrine of *res judicata;* and generally whether an adjudication of the board which allots no water to an existing non-appearing and non-participating claimant amounts to a determination and disposition of his rights. We are disposed, in deciding the reserved question, to confine its scope to the facts shown by the pleadings in the pending case. It is only upon those facts that the question arises, and in so far only as it relates to those facts need it or ought it to be decided.

Although the answer herein avers that by the decree of the Board of Control no amount of water was awarded the plaintiff, it is not alleged that the latter's rights now set up, were considered. And we assume that they were not considered, but were entirely omitted from the board's determination. That seems to be the effect of the pleadings. It may not be improper to say that it is our understanding that under the practice adopted by the board, it eliminates from its consideration and decrees the appropriations of claimants neglecting to come in and submit proofs.

In an earlier part of this opinion we had occasion to allude to some of the particulars wherein the statutory proceeding differs from an ordinary suit in the courts. Affirmative relief in favor of one party as against another

is not its object.   Adversary pleadings, as they are commonly employed and understood, are not involved. Indeed, in the strict sense, except in case of contest, it is doubtful if the various claimants can be regarded as adversaries.   In many instances they are not adversary in fact.   In the very nature of a priority of right to the use of flowing water an appropriator is unable to identify specific water to which he is entitled, unless, indeed, his appropriation extends to all the water of the stream. Hence it is possible that a number of appropriators with diverse interests may be respectively entitled to the use of a portion of the water of the same stream, without having a conflict occur in the exercise of their several rights, owing to the volume of water in their common source of supply, or other natural conditions.

So in Arizona it was held that when there is sufficient water in the river to supply all parties, there can be no such thing as adverse use of the water to start the statute of limitations running; that it is only in times of scarcity when all parties can not be supplied, and one appropriator takes water which by priority belongs to another, that there is an adverse use.   Egan v. Estrada, 56 Pac., 721.

The proceeding before the board is not a part of the process by which an individual appropriation is completed, for that occurs upon a lawful diversion of water open to appropriation and its application to a beneficial use.   But the proceeding is instituted by the board, in an official capacity representing the public, for the purpose of ascertaining the precise rights and priority of each appropriator, to the end that the public records may be furnished an accurate and defined statement thereof, and as an aid to adequate and effective State control of the public waters.

A part of the object also is public recognition of an appropriation previously made, and the issuance of documentary evidence of title.

It does not necessarily follow from the establishment of the priorities of certain appropriators that there are no others entitled to divert water from the same stream.

The awarding of definite amounts of water to one or more claimants does not *ipso facto* amount to a denial of the rights of others, nor depend upon a negation of such rights. In the final determination of the board it may be decreed that a certain claimant did duly appropriate at a certain time a specified amount of water for a certain purpose, without considering at all whether there are prior or subsequent appropriations also. It is, therefore, manifest that a determination of the rights and priorities of several claimants does not necessarily involve the denial of all rights or claims of every other person not mentioned. If the proceeding was one wherein the parties represented in the decree were seeking to quiet their respective titles as against every other person, the result might be altogether different. Then indeed a party duly summoned and failing to appear might well be held concluded.

It is true that the certificates issued upon the decree, number each appropriation according to its proper order. While this furnishes a convenient mode of reference, we do not deem the provision sufficient of itself to bar a nonparticipant from subsequently asserting his claims, nor as conclusively indicating a purpose to forever estop him from doing so. The number assigned to each established priority must be regarded as having relation, naturally, only to those included in the enumeration, and as between them as defining their relative status respectively.

Hence, on the ground alone that while several priorities were established, no amount of water was awarded to a particular existing claimant who did not participate in the proceedings, by appearance, submission of proofs, or otherwise, we are unable to say that the decree of the board is *res judicata* as to him and his rights.

We are therefore constrained to hold that an existing claimant is not concluded as to his water right by a determination of the Board of Control in adjudication proceedings under the statute, wherein they have not been considered, and by a decree which is perforce silent respecting them.

It is probably true that public and private interests will be more securely preserved by a determination in a single proceeding of the right and priorities of every existing claimant; and a law so framed as to effectuate that object, and render the decree conclusive of every accrued claim, would doubtless subserve a useful and salutary purpose. That matter, however, is for legislative cognizance.

The district court is, by the constitution, vested with original jurisdiction both at law and in equity. The jurisdiction of equity to entertain suits for quieting title to the use of water is well settled. The Legislature has not attempted to divest the courts of that jurisdiction, and we do not think it could successfully do so. Although in the statutory proceeding for the determination of water rights, the courts obtain jurisdiction only by way of appeal from the decisions of the Board of Control; all the ordinary remedies known to the law pertinent to the use and appropriation of water, are open to all interested in such rights, equally with all other persons in respect to any other kind of right or property. The courts possess ample jurisdiction to redress grievances growing out of conflicting interests in the use of the public waters, and to afford appropriate relief in such cases. Nothing can be plainer, it seems to us, than that in the absence of a previous determination by the board, or in the courts, of the priorities or rights of claimants upon a particular stream, an interested party may resort to the courts to obtain such relief as he may show himself to be entitled to. The jurisdiction of the courts remains as ample and complete after, as well as before, an adjudication by the board. But the principle applies here as in other cases, that a party may not re-litigate a question which has passed into final adjudication. And the courts will not assume in an independent action, to determine anew the rights of parties, which as between themselves, have been settled by the decree of the Board of Control; at least in the absence of fraud, or a showing of facts sufficient to vitiate a judgment.

Under the statutes now in force, there being no provision expressly barring or estopping a claimant failing to participate in the adjudication proceedings, and the decree not being *res judicata* of the undetermined rights of such a claimant, he is at liberty to assert and maintain those rights in the courts through the regular medium of some form of procedure recognized by the law, for the redress of grievances, or the granting of appropriate relief.

The fifth reserved question inquires whether the provision of the statute for publication of notice, and notice by mail constitutes due process of law. The phrase found in the question "and without actual citation or service of summons" is not happily employed. It assumes before it is decided, that the service by mail is not actual citation and service.

It is contended that the notice provided for does not amount to due process of law. A discussion of the question whether the proceeding is one *in rem* or not might be interesting. In our view it would seem to partake more largely of the nature of a proceeding *in rem* than of one *in personam*. But we deem it sufficient to say that, in our opinion, it is of such a character and affects a species of rights, which would authorize a notice such as is provided for by publication, coupled with a service thereof upon known claimants. The only question, therefore, which we care to discuss at all, is whether the notice by mail will satisfy the constitutional requirements as to due process of law. In Massachusetts it has recently been held that a notice sent by mail as required by law is sufficient. We can not do better than adopt a portion of the language of the opinion of that able court in the case referred to. In delivering the opinion of the court upholding an act providing for the registration of land titles — containing the provisions known as the Torrens system — Mr. Chief Justice Holmes said: "As to claimants living within the State, and known, the question seems to come down to whether we can say that there is a constitutional difference between sending notice

of suit by a messenger and sending it by the post office, besides publishing in a newspaper, recording in the registry, and posting on the land. It must be remembered that there is no constitutional requirement that the summons, even in a personal action, shall be served by an officer, or that the copy served shall be officially attested.''

''Apart from local practice it may be served by any indifferent person. It may be served on residents by leaving a copy at the last and usual place of abode. When we are considering a proceeding of this kind, it seem to us within the power of the Legislature to say that the mail, as it is managed in Massachusetts, is a sufficient messenger to convey the notice, when other means of notifying the party, like publishing and posting, also are required.'' Tyler v. Judges of the Court of Registration, 55 N. E., 812; see also Town of Hinckley v. R. R. Co., 70 Minn., 105.

Now our statute requires the notice to be sent by registered mail, thus insuring more certainly its reaching the proper party, and as well in most instances, securing personal delivery; and in all cases the return of a card indicating its receipt.

We can perceive no reasonable objection to that manner of sending notice to known claimants in the character of proceeding we are considering, at least where publication is also required.

Agreeable to the custom established in the consideration of reserved questions, we do not think it necessary to answer the sixth question, which asks whether the answer is sufficient to constitute a defense to the suit of plaintiff. That must be decided by the district court upon the principles herein laid down, so far as it is affected by the other reserved questions.

We believe it to be unnecessary to attempt to return a categorical and specific answer to each of the reserved questions. We apprehend that our views concerning them have been set forth in the course of the opinion with sufficient distinctness, and that nothing further is required

to indicate our decision upon the questions and the reasons therefor.

CORN, J., and KNIGHT, J., concur.