Submitted on briefs October 30, modified December 11, 1917.

BYERS v. WE–WA–NE.*

(169 Pac. 121.)

**Evidence—Judicial Notice—Congressional Records.**

1. The court can take judicial notice of the public documents throwing light on an act of Congress, and also of the journals of Congress and the congressional records showing the steps which finally led to its enactment.

**Public Lands—"Confirmation."**

2. A legislative confirmation of a claim to land is a recognition of the validity of such claim, and operates as effectually as a grant or quitclaim from the government; a confirmation is a conveyance of an estate or right to land to one who has possession or some estate therein.

**Statutes—Construction—Legislative Intent.**

3. The legislative intent is controlling in the interpretation of a statute.

**Waters and Watercourses—Non-navigable Waters—State Jurisdiction.**

4. A state has jurisdiction over the non-navigable waters within its boundaries.

**Indians—Title to Land—Extinguishment by Statute.**

5. Whatever the rights of the Walla Walla, Cayuse and Umatilla Indians under the treaty of June 9, 1855, ratified March 8, 1859 (12 Stat. 945), it was competent for Congress to terminate them by legislation, as Congress may extinguish Indian titles.

---

*On right of court to take judicial notice of existence and contents of legislative journals, see note in 40 L. R. A. (N. S.) 38,    Reporter.

Waters and Watercourses — Water Rights — Treaties and Statutes — Confirmation—"Existing Right."

6.   The treaty of June 9, 1855, ratified March 8, 1859, between the United States and the Walla Walla, Cayuse and Umatilla Indians set apart to them a tract, and provided that the exclusive right of taking fish in the streams running through and bordering the reservation should be secured to the Indians, and at all other usual and accustomed stations in common with the citizens of the United States, and sought to encourage agriculture and milling, but thereafter the Indians did comparatively little farming.  On July 7, 1870, the Indian agent issued a permit to contestant's predecessor to construct a ditch across part of the reservation to take water from the Umatilla River to the City of Pendleton for milling and other purposes, on condition that no permanent rights should vest and that any ditch might be discontinued by the department, and from 1874 a flour-mill secured its power from the water so diverted.  Act Cong. March 3, 1885, c. 319, 23 Stat. 340, an allotment act, confirmed the water right granted by the agent if it should not impair any existing right to the reasonable use of the water of the stream for agricultural purposes.  *Held*, that an "existing right" to water, as used in the act of 1885, presupposed a plan for its utilization, and that the act confirmed and granted to contestant the rights previously granted by the Indian agent, abridged by no prior claim to the water except the right of the Indians to use it for household purposes and to water livestock.

Indians—Treaties—Construction—Water Rights.

7.   Such treaty of June 9, 1855, did not impliedly appropriate the waters of the Umatilla River for the use of the Indians whenever they should see fit to use such waters, especially where the lands on the reservation did not require water to produce crops, where as late as 30 years after the treaty no Indians were irrigating, where certain parts of the lands could not be irrigated without a prohibitive expense, where the good lands were sufficient for their maintenance, and where a majority of the adult male Indians on the reservation assented to a later act of Congress including a grant of water power for use of flour-mill outside of the reservation by means of ditches diverting the water of the river.

Indians—Treaties—Construction.

8.   Indian treaties should be liberally construed in favor of the Indians and the treaty may be read in the light of the circumstances under which it was negotiated and ratified, and the purposes in view and the situation of the parties may be considered.

[As to the effect of treaties and the power to annul them by hostile legislation, see note in 81 **Am. Dec.** 536.]

From Umatilla: GILBERT W. PHELPS, Judge.

In Banc.   Statement by MR. JUSTICE McCAMANT.

This is a proceeding brought under the authority of Sections 6635–6659, L. O. L., to determine the rights of

the respective parties to the waters of the Umatilla River.

The United States appeared and asserted the rights of sundry of its Indian wards, claiming for them water adequate for the irrigation of so much of their allotments as are situate in the bottoms of the Umatilla River. Sophie Byers thereupon filed a contest, asserting that she is the owner of 10,000 cubic feet per minute of the waters in question for the purpose of operating a flour-mill at Pendleton. She alleges that her rights are paramount to those of the United States and of the Indians on whose behalf the United States claims the water.

A reply was filed to the claim of Mrs. Byers and on the issues so arising a large amount of testimony was taken. The most material facts are not in dispute.

On June 9, 1855, a treaty was entered into by the United States with the Walla Walla, Cayuse and Umatilla Indians and this treaty was ratified by the Senate, March 8, 1859. By the treaty the Indians ceded to the United States a large territory to which they had theretofore asserted title. The treaty set apart to them a smaller body of land and provided:

"That the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians, and at all other usual and accustomed stations in common with citizens of the United States."

The United States agreed to pay the Indians certain sums of money, to erect a flour-mill and other structures, to employ a superintendent of farming operations, and to plow and fence at least ten acres of land for each of the head chiefs. The treaty is found in Volume 35 of Senate Documents at page 522.

It appears that a flour-mill was erected on the reservation, but that it burned about 1884 and was not rebuilt. For many years after the ratification of the treaty the country comprised in the reservation was given over to the raising of livestock. The Indians did comparatively little farming. The pleadings admit that in 1885:

"The lands upon the Umatilla Indian Reservation had not been allotted in severalty and no ditches, races, or canals had been constructed or built, nor had any of the waters of the Umatilla River been conveyed away from the natural and ancient channel thereof."

In 1882 Congress authorized the sale of 640 acres of the land on the western end of the reservation as an additional town site for the City of Pendleton. In 1885 an act was passed for the allotment of the lands to the Indians in severalty with the usual restrictions on alienation. Pursuant to this authority the best land on the reservation has been allotted and is now fenced and farmed. Without irrigation it produces crops of wheat averaging forty bushels to the acre. Some of the land is farmed by the Indians, but in most cases the Indian owners lease to white tenants who pay them a cash rental.

On July 7, 1870, the agent in charge of the reservation, pursuant to authority from the Department, issued a permit to George A. La Dow, F. Coats, Lot Livermore, O. F. Thompson and George W. Bailey to construct a ditch across a part of the reservation to take water from the Umatilla River to the City of Pendleton "for agricultural, milling and other purposes." The permit contained the following qualification:

"In granting this permission to construct the said water ditch, it is upon the express condition that no

permanent rights shall attach or become vested, but that any ditch or canal dug or constructed, and the use of the same, shall be subject to the control of and to be discontinued at the pleasure of the Department.''

The rights acquired under this permit subsequently passed to W. S. Byers and Company, a copartnership. W. S. Byers succeeded to the rights of the copartnership and on the death of W. S. Byers several years ago, his widow, Sophie Byers, became the owner of the rights so initiated. The water so diverted was used at an early date to water lawns and gardens in Pendleton. In 1874 W. S. Byers constructed a flour-mill at Pendleton and thereafter the water was used to supply this mill with power. The mill burned September 20, 1897, but it was rebuilt the following year. Except for this interruption it has been operated continuously since 1874, securing its power from the water diverted by the ditch authorized and constructed in 1870.

The allotment act of 1885 contained the following proviso:

"*Provided further,* That the water right across a certain portion of said reservation from the town of Pendleton granted by the Interior Department July seventh, eighteen hundred and seventy on the application of George A. La Dow, Lot Livermore and other citizens of Pendleton for manufacturing, irrigating and other purposes be confirmed and continued to W. S. Byers and Company, their successors: *Provided,* That this act shall in no way impair or affect any existing right to a reasonable use of the water of said stream for agricultural purposes, nor shall confirm or grant any right to use the water thereof in any manner nor to any extent beyond or different from that to which it has been heretofore appropriated.''

Mrs. Byers contended that the above legislation constitutes a grant of the water right which is superior to any rights possessed by the Indians.

The Byers ditch leaves the Umatilla River near the west boundary of the reservation at a point which was within the reservation when the ditch was constructed, but which is now without the reservation on land owned by contestant. The ditch runs slightly in excess of a mile to the mill. The water leaves the mill by a race and returns to the river without substantial diminution in quantity, a short distance below the mill. There are two other mills on the Umatilla below the Byers mill which make use of this same water.

W. S. Byers and contestant, as his successor in interest, have acquired all lands bordering on the river from the west line of the reservation to a point below the intake of the ditch, with the exception of one small piece.

The witnesses for the United States testify that the bench lands on the reservation could not be irrigated from the Umatilla River without a prohibitive expense. There are about 5,300 acres of bottom land, however, which could be irrigated. The evidence shows that much of this land is rocky and of little value and that the expense of clearing other portions and preparing them for irrigation approximates $100 an acre. The water in the Umatilla is adequate to the irrigation of this bottom land, but only through the use of the water which contestant has been using for the operation of her mill. The United States claims that the right to use the waters of the Umatilla for irrigation was impliedly reserved to the Indians by the treaty of June 9, 1855, and that the act of 1885 granted only a revocable license to use the water, subordinate at all times to the rights of the Indians therein.

The lower court found:

"That the amount of water necessary to operate the mill is about 10,000 cubic feet per minute, or nearly 167 second-feet of water; that the river at Pendleton during the dry time of the year has had a minimum flow of as low as 23 second-feet; that when the water is less than 167 second-feet, then the contestant's mill requires all the water that is flowing in the stream, and has since the building of the mill used practically all of the water flowing in the stream, when the flow was less than 167 second-feet."

"As to the use of water by the Indians, when the United States by the act of Congress of March 3d, 1885, set aside for the use of the Indians the lands included within the Umatilla Reservation, such water as was or might be needed for domestic uses, and for the purpose of agriculture, was also set aside or reserved, and to the extent said waters may be required on the reservation for domestic and agricultural uses by the Indians upon the reservation, there is vested in the Indians a paramount right."

The decree fixed the amount of water to which each Indian is entitled and adjudged that these water rights are paramount to those of contestant so long as the water is used by an Indian. In the event that the water shall be used on the allotments by others than Indians, the priority date is fixed by the decree as 1895. Contestant is awarded 167 second-feet with a priority date of 1870.

Both parties have appealed.          MODIFIED.

For contestant-appellant there was a brief submitted over the names of *Messrs. Fee & Fee* and *Messrs. Raley & Raley.*

For contestees-appellants there was submitted a brief over the names of *Mr. Clarence L. Reames,* United States Attorney, and *Mr. Robert R. Rankin,* Assistant United States Attorney.

MR. JUSTICE MCCAMANT delivered the opinion of the court.

The briefs in this case are exhaustive; they discuss many questions which we do not find it needful to determine. We agree with counsel for the United States in his statement "that upon the interpretation of [the act of 1885] the claim of contestant Byers to the waters of the Umatilla River is sustained or falls." Although contestant's predecessors in interest had used this water for fifteen years prior to 1885, it is conceded that their use during that period was based on a permit revocable by the United States at will.

1. By 1885 the Byers mill had become a valuable property with a capacity of about 500 barrels a day. The Indians made use of it, exchanging their wheat for flour. It was equipped to be operated wholly by water-power and its value was therefore dependent on the water right which was enjoyed by sufferance. The owners of the mill were anxious to secure some better right to the water than they then possessed. They succeeded in convincing the Oregon delegation in Congress and the Indian Bureau that they were entitled to some assurance in this regard. We can take judicial knowledge of the public documents which throw light on the Act of 1885 and also of the journals of Congress and the Congressional record showing the steps which finally led to the enactment of this statute: *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288, 301, 312 (57 L. Ed. 1190, 33 Sup. Ct. Rep. 867).

In 1884 Honorable M. C. George, then a member of the House of Representatives from Oregon, introduced a bill providing for the allotment in severalty of the lands on the Umatilla Reservation; this bill

contained a provision confirming the water right in question. In a report to the Secretary of the Interior on the subject of this bill, the Commissioner on Indian Affairs said:

"There is a provision in the present bill, page 6, not found in the former bill. It confirms to W. S. Byers & Co., successors to George A. La Dow, Lot Livermore, and other citizens of Pendleton, the water right across a portion of the said Umatilla Reservation granted by the Department July 7, 1870. I see no objection to this measure.

"The records of this office show that under date of April 23, 1870, the superintendent of Indian Affairs for Oregon, Col. A. B. Meacham, transmitted a petition signed by George A. La Dow, F. Coats, Lot Livermore, O. F. Thompson, and Geo. W. Bailey, citizens of Pendleton, Oregon, praying for permission to construct a water ditch across a portion of said reservation to the town of Pendleton, for irrigating, manufacturing, and milling purposes. Colonel Meacham recommended the granting of the petition, and accordingly, by letter, dated May 16, 1870, he was authorized by this office to grant the privilege asked for, if it could be done without injury or detriment to the Indians or their property, and upon the express condition that no permanent rights should attach or become vested, and that any ditch or canal dug or constructed, and the use of the same, should be subject to the control of and to be discontinued at the pleasure of the Department."

"On the strength of the authority thus given, a very large sum of money has been expended by Byers & Co. in the construction of a flour and grist mill and the purchase of machinery therefor. The ditch has been in constant use since its construction and the privilege has been of untold benefit to the people of Pendleton and surrounding country, and of no little service to the Indians themselves.

"I believe the right should be confirmed to Byers &
Co., and I accordingly so recommend.    No damage can
result to the Indians thereby.''

This report was transmitted by the Secretary of
the Interior with a statement that this official could
see no objection to the passage of the bill confirming
the water right.

These documents unequivocally demonstrate the
approval by the Indian Bureau of the proposed con-
firmation.    The House bill introduced by M. C. George
never became a law.

About the same time Hon. James H. Slater, United
States Senator from Oregon, introduced Bill No. 938
in the Senate.    This bill recited in a preamble the
license granted to La Dow and others, the transfer
to W. S. Byers and Company of the rights arising
thereunder, the belief of Byers that the water rights
were indefeasible and the investment of a large sum
of money in reliance on that belief.    The body of the
bill·is as follows:·

"Be it enacted by the Senate and the House of
Representatives of the United States of America in
Congress assembled, that the right of W. S. Byers,
Robert G. Thompson, and Jeremiah Barnhart, now con-
stituting the firm of W. S. Byers · and Company, of
the town of Pendleton, in the State of Oregon, to take
water from the Umatilla River at a point on the
southwest quarter of the southwest quarter of Sec-
tion one, in township two north, range thirty-two east
of the Willamette meridian, on the Umatilla Reserva-
tion, in the said State, in the manner and to the ex-
tent heretofore and now taken by the said Byers and
Company, and to convey the same, by means of a
ditch, race, or otherwise, to the mill of said company
in the town of Pendleton, for manufacturing and other
purposes, together with the right of way for said
ditch or race as at present constructed through and

over lands of the said reservation, is hereby confirmed to them, their heirs and assigns, and each of said parties shall take and become seized of the rights herein confirmed in the ratio of his interest held and owned in the said firm of W. S. Byers and Company.''

This bill was referred to the Committee on Indian Affairs, February 20, 1884. The committee reported recommending that the bill be passed with the following amendment:

''This Act shall in no way impair or affect any existing right to a reasonable use of the water of said stream for agricultural purposes.''

The Bill came up for consideration April 25, 1884. Senator Harrison commented on it as follows:

''The case, according to the report, seems to be this: In 1870, under a license granted by the Commissioner of Indian Affairs, these parties constructed a ditch to take water from a stream somewhere on the Umatilla reservation, the ditch being something like one mile in length. They paid nothing for the right to the Indians or anybody else. It was expressly stipulated in the grant that it was a mere license revocable at the pleasure of the Indian Department. It seems they have gone on and constructed a mill and are using this water-right, which I should conclude to be a very valuable one, taking the water not at a point where they have any riparian rights at all, but where if there are any riparian rights they belong to the Indians.

''It is not clear by the report whether the point at which the water is taken from the stream is within the reservation as now reduced under recent legislation, but if it is it seems to me there is no reason why a valuable water-right, as this evidently is, should be confirmed to these gentlemen without the payment of a dollar to anybody. The bill is an absolute confirmation of their title, so far as the Government can confirm it, for all future time, when they have paid no consideration for it to anyone. It is intended to give

them an exclusive right to a large body of water which may be valuable for other purposes, and to which other people may have some right, so far as I know from the report; and I do not think the bill ought to pass."

Senator Slater answered these objections and the bill was thereupon passed by the Senate. We cannot find that it ever came to a vote in the House.

On April 30, 1884, the Senate passed Senate Bill No. 66 providing for the allotment in severalty of lands on the Umatilla Reservation. On February 24, 1885, this Bill came up for consideration in the House and by a vote of 79 to 4 the following amendment was added:

"*Provided further,* That the water-right across a portion of said reservation through the town of Pendleton, granted by the Interior Department July 7, 1870, on the application of George A. La Dow, Lot Livermore, and other citizens of Pendleton, for manufacturing, irrigating, and other purposes; be confirmed and continued to W. S. Byers & Co., their successors."

The Bill was thereupon passed and returned to the Senate for concurrence in the House amendments. The Congressional Record shows that the report of the Commissioner of Indian Affairs above quoted was called to the attention of the House and that the Bill went over by request in order that it might be more maturely investigated.

On February 25, 1885, the Senate again considered Senate Bill No. 66 on the question of the House amendments. After some discussion the Senate amended the Bill by adding the following:

"*Provided,* That this act shall in no way impair or affect any existing right to a reasonable use of the water of said stream for agricultural purposes, nor shall confirm or grant any right to use the water

thereof in any manner nor to any extent beyond or different from that to which it has been heretofore appropriated.''

The House subsequently concurred in this amendment and the act as finally passed is in form as quoted in the statement of facts.

The foregoing review of this legislation makes plain the following facts:

1. The purpose in view on the part of the Oregon delegation in Congress was to transfer the license theretofore enjoyed by W. S. Byers and Company into a grant.

2. The Indian Bureau believed that the mill operated by this water was ''of no little service to the Indians'' and that ''the right should be confirmed.''

3. The House acted deliberately and with the recommendation of the Indian Department before it.

4. The attention of the Senate was called by Senator Harrison to the fact that it was granting a valuable right without compensation and with this objection pointed out the Senate passed the Bill. It is of no consequence that these matters are made to appear by the debate on other bills than that finally passed. The other bills involved the same subject matter and were pending in the same Congress.

2. Unless the language of the Act requires us so to do, we ought not to hold that this Act left the parties where they were before the legislation was enacted. The salient language in the Act is: ''That the water right * * be confirmed.''

What is the legal significance of the word ''confirm?'' In *Turk* v. *Skiles,* 45 W. Va. 82 (30 S. E. 234, 235), it is said:

''Here is the word 'confirm.' It has a legal force under the law of conveyances. * * Lord Coke de-

fines it [a confirmation] to be: 'A conveyance of an estate or right *in esse,* whereby a voidable estate is made sure and unavoidable, or a particular estate increased.' 2 Lomax Dig. 101. To make sure a voidable estate is the proper office of confirmation. 2 Minor, Inst. 717.''

In *Missouri etc. Ry. Co.* v. *Ransom,* 15 Tex. Civ. App. 689 (41 S. W. 826, 830), the court says: "A confirmation is making firm what was before infirm." The foregoing decisions were handed down subsequent to the enactment of the statute in question. They are less persuasive of the congressional intent than authorities with which the members of Congress were presumably familiar when the Act was passed. The case of *Langdeau* v. *Hanes,* 21 Wall. 521, 530 (22 L. Ed. 606), was decided in 1874. In this case it is said:

"A legislative confirmation of a claim to land is a recognition of the validity of such claim, and operates as effectually as a grant or quitclaim from the government."

The case of *Morrow* v. *Whitney,* 95 U. S. 551, 554 (24 L. Ed. 456), decided in 1877, holds that: "A confirmation is a conveyance of an estate or right in lands to one who has the possession or some estate therein." In Sheppard's Touchstone, 311, it is said:

"A confirmation is the conveyance of an estate or right, that one hath in or unto lands or tenements, to another that hath the possession thereof, or some estate therein, whereby a voidable estate is made sure and unavoidable, or whereby a particular estate is increased and enlarged."

3. By the aid of these authorities we can unmistakably grasp the legislative intent which is controlling in the interpretation of this statute. The predecessors in interest of this contestant were in the enjoyment

of a valuable right which they held by a precarious tenure. This right was infirm and Congress confirmed it. That which they had enjoyed by sufferance became theirs of right. A revocable license became a grant from the sovereign.

4, 5. At the time when this statute was passed Oregon had been admitted to the Union for twenty-six years. It had all the rights of a sovereign state and among these is jurisdiction over the non-navigable waters within its boundaries: *Kansas* v. *Colorado,* 206 U. S. 46 (51 L. Ed. 956, 27 Sup. Ct. Rep. 655, 666); Pomeroy on Riparian Rights, § 31. By the Act in question the United States spoke as an owner granting that which it had the right to bestow, not as a sovereign defining a rule of action by legislative fiat. Whatever the rights of the Indians under the treaty of 1855, it was competent for Congress to terminate them by legislation. It is held that Congress may extinguish the Indian title; *Beecher* v. *Wetherby,* 95 U. S. 517, 525 (24 L. Ed 440); *United States* v. *Four Bottles Sour-Mash Whiskey,* 90 Fed. 720, 722, 723.

"A statute is a law equally with the treaty, and if subsequent and conflicting with the treaty, supersedes the latter"; *Horner* v. *United States,* 143 U. S. 570, 578 (36 L. Ed. 266, 12 Sup. Ct. Rep. 522); *Head Money Cases,* 112 U. S. 580, 598, 599 (28 L. Ed. 798, 5 Sup. Ct. Rep. 247); *Stephens* v. *Cherokee Nation,* 174 U. S. 445, 483 (43 L. Ed. 1041, 19 Sup. Ct. Rep. 722).

In *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 566 (47 L. Ed. 299, 23 Sup. Ct. Rep. 216), it is said:

"The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves,

that it should do so. When therefore treaties were entered into between the United States and a tribe of Indians it was never doubted that the power to abrogate existed in Congress.''

We may say parenthetically that it affirmatively appears from the record in this case that a majority of the male adult Indians on the reservation assented in writing to the Act of 1885 including the grant under which contestant claims.

6. It remains to interpret the qualifying clauses which Congress has attached to the grant.

"*Provided,* That this act shall in no way impair or affect any existing right to a reasonable use of the water of said stream for agricultural purposes, nor shall confirm or grant any right to use the water thereof in any manner nor to any extent beyond or different from that to which it has been heretofore appropriated.''

These clauses were added to the Act in the Senate as the result of careful consideration of the subject by that body. The House subsequently concurred in these amendments and they are to be given full force and effect in accordance with the congressional intent. The government contends that the treaty of 1855 impliedly reserved to the Indians the right to use these waters to irrigate so much of the Umatilla bottoms as lay within the boundaries of the reservation; that this was an existing right comprehended by the foregoing language and that therefore the United States as guardian of the Indians retained the paramount right to the water for the purpose aforesaid after 1885 as before. There is no suggestion in the congressional debates that any such thought was in the mind of a single member of Congress. If the reservation involved the plenary right to take the water for the use of the Indians, the grant

was a revocable license and W. S. Byers and Company were in no better position as the result of the legislation. If it be said that the only right reserved is a right to be exercised for the benefit of the Indians, the answer is that the United States had nothing to grant except what it held for the Indians and the grant was based in part on the recommendation of the Indian Bureau as one which would inure to the benefit of the Indians. There is no escape from the conclusion that to sustain this branch of the government's contention is to deprive this portion of the Act of 1885 of all vitality and substantial effect. Such a construction is forbidden by the canons for the interpretation of statutes.

The word "existing" is significant. An existing water right presupposes a well-defined plan for the utilization of the water, coupled with reasonable diligence in applying it to a useful purpose: *Hindman* v. *Rizor,* 21 Or. 112, 117, 118 (27 Pac. 13); *Mann* v. *Parker,* 48 Or. 321, 323 (86 Pac. 598); *Williams* v. *Altnow,* 51 Or. 275, 297 (95 Pac. 200, 97 Pac. 539); *Hough* v. *Porter,* 51 Or. 318, 391 (95 Pac. 732, 98 Pac. 1083, 102 Pac. 728); *Cookinham* v. *Lewis,* 58 Or. 484, 491 (114 Pac. 88, 115 Pac. 342); *In re Waters of Umatilla River,* 87 Or. — (168 Pac. 922). The evidence negatives the existence of any such user or plan. The pleadings admit that in 1885, when the Act in question was passed, there was no irrigation of these bottom lands by the Indians. Without doubt the river was used for domestic purposes and for the watering of stock, but no Indian had initiated any right to use the water for irrigation.

Oregon was a far country to the average member of Congress in 1885. The amendment containing the

above proviso was offered by Senator Dawes of Massachusetts. It manifests his desire to protect any farmer, Indian or white man, who had taken such steps as gave him an existing right to use the water for agricultural purposes.

The preponderance of the evidence is to the effect that the water is being used in the operation of contestant's mill to the same extent and in the same manner as in 1885. The output of the mill has been largely increased, but the increase is due to modern machinery and improved methods. The ditch is of the same size, and the use of the water is identical in manner and extent with that of 1885. We conclude, therefore, that the water right which contestant now enjoys was granted to her predecessors by the deliberate and intelligent action of Congress and that this right is abridged by no prior claim to the water except the right of the Indians to use it for household purposes and to water livestock.

7, 8. We are also unable to concur with counsel for the United States in their construction of the treaty of 1855. There is no mention of water in this treaty except in connection with the exclusive fishing right granted to the Indians. If the treaty were a compact between peoples of equal intelligence we could apply the maxim, *"Expressio unius exclusio alterius."* It is true, as contended by the counsel for the government, that Indian treaties should be construed liberally in favor of these unlettered people: *United States* v. *Winans,* 198 U. S. 371, 380 (49 L. Ed. 1089, 25 Sup. Ct. Rep. 662) ; *United States* v. *Seufert Bros. Co.,* 233 Fed. 579, 584. Under any rule of construction, if it is proposed to base on the treaty such a right as that contended for by the government, there must be found in the treaty something from which the right can be

implied.  The treaty may be read in the light of the circumstances under which it was negotiated and ratified.  Consideration may be given to the purposes in view and to the situation of the parties, but unless the implication of these water rights is found in the treaty when read in the light of these purposes and circumstances, the rights contended for must be held to be nonexistent.

On this branch of the case the government relies on *Winters* v. *United States,* 143 Fed. 740, 747 (74 C. C. A. 666); affirmed in 207 U. S. 564, 576 (52 L. Ed. 340, 28 Sup. Ct. Rep. 207), and *United States* v. *Conrad Investment Co.,* 156 Fed. 123, affirmed in 161 Fed. 829 (88 C. C. A. 647).  The first of these cases involved the construction of a treaty negotiated in 1888 for the creation of the Fort Belknap Indian Reservation in Montana.  The treaty evidenced an intention that the Indians should farm the lands on the reservation and they could not be farmed without irrigation.  Mr. Justice McKENNA says on page 576 of 207 U. S.: "The lands were arid and without irrigation were practically valueless."  The northern boundary of the reservation was Milk River and aside from this stream there was but little water on the reservation.  Immediately after the negotiation of the treaty and as early as 1889 a portion of the water of Milk River was used for irrigation and the use was continuous thereafter until interrupted by the acts complained of.  In 1895 the defendants began the diversion of the waters of Milk River above the reservation and continued such diversion until all the waters were carried away into their canals and ditches, leaving no water for the Indians.  The defendants claimed the water under appropriations made long subsequent to the treaty and subsequent to the user of the water by

the Indians. Their appropriations were based on the
Desert Land Act of 1877. Under these circumstances
the District Court, the Circuit Court of Appeals
for the Ninth Circuit and the Supreme Court all held
that the rights of the Indians were paramount, that
the treaty impliedly reserved to them the waters of
Milk River without which they could raise no live-
stock and till no land.

The Conrad Investment Company case also involved
the right to divert water which in its ordinary course
flowed through an Indian reservation in Montana.
The Blackfeet reservation was created by treaty in
1888. The Conrad Investment Company claimed
under an appropriation made in 1897 above the reser-
vation. It does not appear from the record whether
due diligence was used in following up this appropria-
tion, but the evidence showed that the defendant's
works were constructed between 1900 and 1904. In
1898 the government initiated for the benefit of the
Indians an irrigation system adequate to the supply of
9,000 to 10,000 acres of land. The diversion by the
Conrad Investment Company of the waters of Birch
Creek above the reservation practically destroyed the
government irrigation system. The land was arid and
"without irrigation it was impossible to raise grain or
a crop of grass heavy enough to cut for winter feed-
ing." It was held that the rights of the Indians were
paramount and that there was an implied reservation
in the treaty of a right to so much water as should be
required to irrigate the tillable lands on the reserva-
tion.

These authorities do not hold, as we read them, that
the mere creation of an Indian reservation by treaty
impliedly secures to the Indians all water in streams
which touch the reservation which they may at any

time desire to put to a useful purpose. The Indians
were given arid lands which could not be farmed with-
out irrigation; it was the purpose of the government to
induce them to farm, a purpose manifest on the face
of the treaty. Under these circumstances the courts
found in the treaties an implied grant of the water
rights in question. The practical construction of the
treaties accorded with this conclusion; in each case
important irrigation projects were started shortly
after the negotiation of the treaties.

The facts in the case at bar differentiate it from
these authorities. The pleadings admit that in 1885,
thirty years after the negotiation of the treaty, no In-
dians were irrigating. The lands on the reservation
do not require water to produce crops. It clearly ap-
pears that they can be profitably farmed without irri-
gation, that an average dry-land crop of wheat is forty
bushels to the acre. The government's witnesses tes-
tify that the bench lands cannot be irrigated without
an expense which would be prohibitive. The reserva-
tion includes a wheat belt fifteen miles wide. There
were 1,184 allottees when the land was allotted and on
June 30, 1912, the Indians on the reservation numbered
1,114. The good lands are abundantly sufficient
for their maintenance. The allotted lands aggre-
gate 80,800 acres and there is a surplus of unal-
lotted lands amounting to 80,000 acres. It is proposed
to irrigate only 5,300 acres of land in the Umatilla
bottom. In speaking of this land, Marion Jack, a
witness for the government, testifies:

"There is patches of awful good land, but gener-
ally speaking it is rocky and gravelly."

He further testifies that half of these bottom lands
are rocky and gravelly and that it takes four times

as much water to irrigate gravelly land as to irrigate loam. The evidence shows that it would cost in the neighborhood of $100 an acre to clear and level this land and fit it for irrigation. The evidence further shows that the upper Umatilla is a mountain stream, constantly changing its channels and subject to frequent freshets.

The treaty has received a practical construction out of harmony with the present contentions of the government. The evidence indicates that these contentions are an afterthought. The United States has undertaken the reclamation of a large tract of land on the lower Umatilla and a considerable population is living on the lands so reclaimed. The waters involved in this suit are needed for the project which the government has in hand. Such irrigation as has taken place on the reservation has been sporadic and has involved a small acreage. One witness testifies that there was no irrigation on the reservation prior to 1890.

We cannot find in the circumstances and conditions attending the negotiation of the Indian treaty of 1855 any suggestion that the waters of the Umatilla River were impliedly appropriated for the use of the Indians whenever they should see fit to avail themselves of these waters. The language of the treaty is silent on the subject. The right claimed is not essential to the maintenance of the Indians or to their progress in the arts of civilized life.

On the whole case we are satisfied that the rights of the Indians are paramount only to the extent of the water which they require for household use and the watering of livestock. With this qualification the rights of contestant as adjudicated by the Circuit Court are superior and paramount to those of the

United States as guardian of the Indians. The decree of the lower court is modified accordingly.

MODIFIED.

MR. JUSTICE BEAN took no part in the consideration of this case.