MARY MERRILL, H. TRIANGLE LIVESTOCK COMPANY, INC., a Wyoming Corporation, JOHN A. GRABOSKI, H. O. DAVIS and BERTHA JONES,

*Plaintiffs and Appellants,*

vs.

L. C. BISHOP, as State Engineer of the State of Wyoming, THANE H. BALDWIN, JR., as Water Superintendent for Division No. 3 of the State of Wyoming, P. T. STRAIN, as Water Commissioner at Large for the State of Wyoming, and as Assistant State Engineer of the State of Wyoming, WILLARD BADER, as Water Commissioner of District No. 5 of Division No. 3 of the State of Wyoming, CLYDE DUNCAN and FORREST DANIELS, and the successors in office of the Defendants, Bishop, Baldwin, Strain and Bader,

*Defendants and Respondents.*

(No. 2669; September 13th, 1955; 287 Pac. (2d) 620)

300

Heard before Riner, Chief Justice; Blume, Justice; and Kline, District Judge.

For the plaintiffs and appellants the cause was submitted upon the brief of W. M. Haight of Riverton, Wyoming, and Joseph Cavalli of Thermopolis, Wyoming, and oral argument by Mr. Haight.

For the defendants and respondents the cause was submitted upon the brief of Howard B. Black, Attorney General; Paul T. Liamos, Jr., Deputy Attorney General; James L. Hettinger, Assistant Attorney General; Robert A. McKay, Assistant Attorney General and oral argument by Mr. Black.

## OPINION

BLUME, Justice.

This is an action to enjoin the State Engineer and other water officials from interfering with and closing their head gates in connection with their water rights from Owl Creek in Fremont county, Wyoming, and tributaries thereof. The case is here the second time. See Merrill v. Bishop, 69 Wyo. 45, 237 P. 2d. 186. The first time the case was before us it involved the question as to whether or not a demurrer filed to the petition herein was properly sustained on account of defect of parties. We held there was no such defect of parties in view of the fact that the demurrer admitted the plaintiffs had superior rights to any of the waters involved herein. Thereafter a second amended petition was filed herein which, however, with minor differ-

ences is approximately the same as the original petition filed in the cause. However, successors in office of any of the water officials, and Clyde Duncan and Forrest Daniels were added as parties. The latter two filed a pleading claiming substantially the same rights as the plaintiffs, except as to the difference in land. The water officials appeared and answered, denied that plaintiffs and parties situated like them had any superior water rights as claimed by them, and denied that they unlawfully interfered with and closed the head gates of plaintiffs and others situated likewise. After trial o f the case, the trial court denied an injunction, found in favor of the water officials and against the plaintiffs and Forrest Daniels. Clyde Duncan appeared on the witness stand and stated that he was satisfied with the distribution of water to him, and the cause was accordingly dismissed as to him. Judging from the brief of counsel for the appellants, his right was adjudicated by the federal district court of Wyoming on June 26, 1916, and seems accordingly to be res judicata at least so far as the water officials of the state are concerned.

The facts herein are substantially as follows: In July 1868, a treaty was entered into between the Indians and the United States pursuant to which, among other things, an Indian Reservation generally known as the Shoshoni or Wind River Reservation was created. That Reservation as so created extended from Owl Creek in the north to Sweetwater and Papo Agie Rivers on the south with the Big Horn River on the east and extending some miles west from that river. Article 6 of that treaty provided:

"If any individual belonging to said tribes of Indians, or legally incorporated with them, being the head of a family, shall desire to commence farming, he shall have the privilege to select in the presence and with the assistance of the agent then in charge, a tract of

land within the reservation of his tribe, not exceeding three hundred and twenty acres in extent, which tract so selected, certified, and recorded in the 'land book,' as herein directed, shall cease to be held in common, but the same may be occupied and held in the exclusive possession of the person selecting it, and of his family, so long as he or they may continue to cultivate it.

"Any person over eighteen years of age, not being the head of a family, may in like manner select and cause to be certified to him or her, for purpose of cultivation, a quantity of land not exceeding eighty acres in extent, and thereupon be entitled to the exclusive possession of the same as above described. For each tract of land so selected a certificate, containing a description thereof, and the name of the person selecting it, with a certificate endorsed thereon that the same has been recorded, shall be delivered to the party entitled to it by the agent, after the same shall have been recorded by him in a book to be kept in his office subject to inspection, which said book shall be known as the "Shoshonee (eastern band) and Bannack Land Book.' "

Article 11 of that treaty also provided:

"No treaty for the cession of any portion of the reservations herein described which may be held in common shall be of any force or validity as against the said Indians, unless executed and signed by at least a majority of all the adult male Indians occupying or interested in the same; and no cession by the tribe shall be understood or construed in such manner as to deprive without his consent any individual member of the tribe of his right to any tract of land selected by him, as provided in Article VI, of this treaaty."

The foregoing treaty was approved by the Congress of the United States on February 24, 1869. On April 21, 1904, the foregoing treaty was amended by an addition thereto, approved by Congress on March 3, 1905. Pursuant to this treaty, the Shoshoni or Wind River Indians ceded to the United States a portion of the lands specified in the treaty, namely that portion situated between Owl Creek on the north and Wind River

to the south. The lands involved in this case are situated within the boundaries of the lands ceded in 1904. The last mentioned treaty contains the following provision as Article 10:

"It is further understood that nothing in this agreement shall be construed to deprive the said Indians of the Shoshone or Wind River Reservation, Wyoming, of any benefits to' which they are entitled under existing treaties or agreements, not inconsistent with the provisions of this agreement."

The lands of the plaintiffs herein (white persons) were originally allotted to Indians pursuant to the foregoing treaties, and by.them conveyed to plaintiffs. It is alleged that patents for these allotments were issued in August 1916, one on July 29, 1918, one on January 11, 1919, one on October 28, 1919, one on August 19, 1932. It does not appear whether or not the lands involved herein were occupied by the Indians previous to the time that patents or certificates were issued to them, nor does it appear when the plaintiffs herein bought the lands from these Indians.

Plaintiffs herein contend that their rights originated under the treaty of 1868 and that accordingly they and each of them have a water right for each and every irrigable acre of land owned by them with a priority of 1868 and hence superior to the rights of any other appropriators from Owl Creek or its tributaries, the earliest of which originated in about 1880. The water officials on the o ther hand contend that the plaintiffs and Forrest Daniels failed to show that they were entitled to any specific amount of water, and that an injunction herein was properly denied. The brief of the Attorney General further states:

"It was contended at the trial of the case and is still contended that where an Indian has applied water to a beneficial use, for instance, on a date of September 1, 1910, and continues to use the water without abandon-

ment and sells his land in 1915 to a white man, the white man would be entitled to claim a beneficial use relating back to September 1, 1910. It is, of course, our position that where no beneficial use of water is shown until after the Indian has disposed of his land to a white man, the white man is not entitled to any theory of relation back to a priority of the time of the Indian Treaty of 1868."

In Winters v United States, CCA Mont., 143 F 740, affirmed 148 F. 684, 207 U. S. 564, 28 S. Ct. 207, 52 L. Ed. 340, the court had under consideration a treaty of Indian lands ceded to the United States situated in the state of Montana. The treaty did not expressly reserve any water rights but the court held it was reserved impliedly, inasmuch as water was necessary for the use of the Indians. It may be noted in the statement of facts in that case that prior to the time any water had been appropriated from the stream in question by parties outside the reservation, the Indians and their agents had appropriated water for use of the buildings of the agency and land in connection therewith and had further appropriated water for the use of some 30,000 acres of land in the reservation. The court, however, did not discuss these facts, so we do not know whether or not they had any influence in the decision of the case. The same situation appears in the case of Conrad Inv. Co. v. United States, 161 F. 829, 88 CCA 647. Appellants rely strongly on the case of United States v. Powers, 94 F. 2d. 783, affirmed 58 S. Ct. 344, 305 U. S. 527, 83 L. Ed. 330. We do not find that case to have any particular bearing on the case at bar except that it affirms the rule laid down in Winters v. United States, supra.

In Skeem v. United States, CCA Idaho, 273 F. 93, the court considered the treaty of 1868, heretofore mentioned, as well as other treaties and considered allotments made to Indians pursuant thereto. It seems

that in 1889 and for some years prior thereto these allotments were cultivated and irrigated at least to some extent. It further seems that the lands embracing these allotments were subsequently ceded by the Indians by treaty of 1898, which however, provided in Article 8 as follows:

"That water from streams on that portion of the reservation now sold which is necessary for irrigating on land actually cultivated and in use shall be reserved for the Indians now using the same, so long as said Indians remain where they now live."

It was contended that the Indians were limited to the use of water then actually used for irrigation. But the court held that they could enlarge the use thereof. The court did not express itself as to how long the right to such enlargement of use should apply. In view of the fact that an appropriation of water for beneficial use had actually been made, we are not prepared to disapprove of the decision. United States v. Hibner, 27 F. 2d 909, decided by the federal district court of Idaho, seems to go somewhat farther, holding, if we understand the decision, that the right to the use of water for Indian allottees continues indefinitely whether use thereof is made or not, with a priority of the date of the treaty of 1868. The court remarked that the water not used by the Indians could be used by others, but such limited use would, of course, be rather precarious and hardly of the character to induce them, to expend money and effort to develop any of their lands. The court further considered the rights of white men purchasing Indian allotments. It held that their rights were somewhat different from that of Indians, inasmuch as they were subject to the laws of the state; that they acquired by their purchase the right to use the water actually applied by the Indians to beneficial use; but that, instead of having the right of the Indians to apply the water to beneficial use for an indefinite

time, they were limited to a reasonable time for the enlargement of the use. See also United States v. Alexander, CCA Mont., 131 F. 2d 359; United States v. McIntire, CCA Mont., 101 F. 2d 650.

Are the holdings in these cases controlling in the case at bar?We do not think so. It must, of course, be admitted that according to the holding in Winters v. United States, supra, the water rights appurtenant to the Indian Reservation here in question were reserved to the Indians by the treaty of 1868. At the same time it appears to be equally well settled that the rights of the Indians are under the absolute control of Congress and may be modified or nullified or repealed by a subsequent act of Congress. In Ward v. Race Horse, 163 U. S. 504, 16 S. Ct. 1076, 41 L. Ed. 244, it was held that hunting rights reserved to the Indians in a treaty were nullified by the act of admission of Wyoming to the Union on an equal footing with the remainder of the states.

In Lone Wolf v. Hitchcock, 187 U. S. 553, 556, 23 S. Ct. 216, 47 L.Ed. 299, the court said: "The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should be so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the power to abrogate existed in Congress." In the case of Byers v. Wa-wa-ne, 86 Or. 617, 169 P. 121, 125, the court stated: "Whatever the rights of the Indians under the treaty of 1855, it was competent for Congress to terminate them by legislation. It is held that Congress may extinguish the Indian title." To the same effect are Thomas v. Gay, 169 U. S. 264, 18 S. Ct.

340; Stephens v. Cherokee Nation, 174 U. S. 445, 19 S. Ct. 722, 43 L. Ed. 1041; and numerous other cases decided by that tribunal. See also 42 C.J.S. 701.

In United States v. McIntire, 101 F. 2d 650, 654, the court held that the Montana laws relative to water rights were not applicable in that case for the reason that Congress had not permitted it. The court stated: "Likewise, the Montana statutes regarding water rights are not applicable, because Congress at no time has made such statutes controlling in the reservation. In fact, the Montana enabling act specifically provided that Indian lands, within the limits of the state, 'shall remain under the absolute jurisdiction and control of the Congress of the United States'." In Winters v United States, 207 U. S. 564, 573, the Attorney General of the United States freely admitted the following: "While the United States may itself abrogate rights granted to the Indians under a treaty with them, it alone has this power, and unless such rights are abrogated by the United States itself by subsequent legislation it is well settled that all rights acquired by the Indians under the treaty are to be fully protected against invasion by other parties." The Supreme Court in that case evidently conceded the principle hereinbefore mentioned but held that it was inapplicable in that case. It was there contended that the reservation of water rights in the treaty with the Indians in 1888 was repealed by the act of Congress admitting Montana in 1889 into the Union on an equal footing with other states. The court held this contention could not be sustained; that while the water rights were reserved to the Indians in 1888, it was unreasonable to hold that these rights were by Congress intended to be abrogated the following year.

The situation in this case is altogether different. Congress, in admitting Wyoming on July 10, 1890, (26 Statutes at Large 222, Ch. 664), did much more than

merely admit it on an equal footing with the remainder of the states. In that act, after reciting that a constitution had been duly ratified and adopted by the people, Congress then provided:

"Be it enacted, etc., That the state of Wyoming is hereby declared to be a state of the United States of America, and is hereby declared admitted into the Union on an equal footing with the original states in all respects whatever; and that the constitution which the people of Wyoming have formed for themselves be, and the same is hereby, accepted, ratified, and confirmed."

The latter part of this provision is not found in the act of admission of Montana. In that state, as heretofore mentioned, the rights of the Indians were reserved (25 Statutes at Large 676, Ch. 180, sec. 4), while the act of admission of Wyoming contains no reservation of rights to the Indians whatever. Among other things the constitution of Wyoming, which as above mentioned was accepted, ratified and confirmed, contains the following provisions:

Article 8, Sec. 1. "The water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state, are hereby declared to be the property of the state."

Article 8, Sec. 3. "Priority of appropriation for beneficial uses shall give the better right. No appropriation shall be denied except when such denial is demanded by the public interests."

The provisions of the act of admission had the same effect, we think, as an independent act of Congress enacting the provisions of our constitution heretofore quoted. That was the view expressed by this court in Farm Investment Co. v. Carpenter, 9 Wyo. 110, 135, 136, 61 P. 258, 50 L.R.A. 747.

In Beecher v. Wetherby, 95 U. S. 517, 523, 24 L.Ed. 440, the court held that when a state is admitted to the

Union and is granted sections 16 in the state upon certain conditions to be ratified by the constitution of the state, and the ratification was made, then the condition became unalterable and obligatory on the United States. The court said in part: "With the Constitution the State was admitted into the Union in May, 1848. 9 Stat. 233. It was, therefore, an unalterable condition of the admission, obligatory upon the United States, that section sixteen (16) in every township of the public lands in the State, which had not been sold or otherwise disposed of, should be granted to the State for the use of schools. It matters not whether the words of the compact be considered as merely promissory on the part of the United States, and constituting only a pledge of a grant in future, or as operating to transfer the title to the State upon her acceptance of the propositions as soon as the sections could be afterwards identified by the public surveys. In either case, the lands which might be embraced within those sections were appropriated to the State.  *  *  *  They could not be diverted from their appropriation to the State." The court cites Cooper v. Roberts, 18 How. 173, 15 L.Ed. 338, and that case was followed in Morrison v. United States, 212 F. 29. The rule has been modified as to unsurveyed public land. See United States v. Wyoming, 331 U. S. 440, 91 L.Ed. 1590. But we find no modification of the principle that the compact between the United States and Wyoming is unalterable and obligatory. Water rights are property just as land, and the situation in the case at bar is so strikingly analogous to that of the foregoing case that it would seem the same rule should be applied, notwithstanding that the state holds the water merely as trustee for the public and not in a proprietary capacity. It is subject to appropriation as provided in its constitution. And when Congress provided, when it accepted and approved the constitution of the state, that priority of

appropriation of water should give the better right, without making any exceptions, it thereby seems to have created a usufructuary right in appropriators without regard to whether these appropriators are Indians or white men. The rule is uniform and explicit and we cannot see that we can engraft an exception thereon in favor of individual Indians. Hence it would seem the rights reserved to Indians in the treaty of 1904 must be construed in the light of, and as limited by, the act of admission.

We shall not, however, in deciding this interesting and heretofore undecided question involved herein, go further than is necessary, and shall, as far as possible, leave undecided points on which the Supreme Court of the United States is the ultimate authority. And so we do not pass upon the right of the United States or the Indians in so far as it concerns water and lands that still remain within an Indian reservation. The federal government being in absolute control thereof and having complete jurisdiction there, the federal courts may hold that the water rights were impliedly reserved notwithstanding the broad language contained in the act of admission of Wyoming. Judge Kennedy of the U. S. District Court of Wyoming, in United States v. Parkins, 18 F. 2d 642, considered that these rights were reserved by the United States for the benefit of the Indians. He did not, however, discuss the constitution of Wyoming or the act of admission thereof. The lands involved in this action became a part of the public domain when Congress on March 3, 1905, approved the treaty of 1904. Furthermore, there is no evidence in the case that any of the Indian allotments here in question were granted prior to that time. So it is not necessary to consider what the law would be if these allotments had been granted while the lands herein involved were still contained in an Indian Reservation. It would seem then that the power to grant allotments after

March 3, 1905, remained pursuant to that treaty, but only just as the power existed to acquire a homestead in that area, each with the qualification that water rights could be acquired only by appropriation thereof with a priority according to the time of the appropriation. If that were not so then if it should happen that there are still lands within the ceded area of 1904 that might now be allotted to Indians, he or they would then have a water right superior to all the rights acquired by appropriation during the last 75 years. To so hold would, we think, go beyond the mere protection of the weak against the strong. While Indian rights are to be regarded favorably, that should be done within reasonable limits. That the Indian allottees herein were not ignorant of the laws of appropriation of water is clearly demonstrated by the evidence in this case.

It must not be concluded, however, that the rights of plaintiffs herein are governed solely by the statutory provisions of the state governing the appropriation of water. It is perhaps somewhat doubtful that Congress meant to consent to all the statutory rules so far as Indians are concerned, though it consented to the provisions in the constitution. It may be doubtful, for instance, that it consented that a water right must be initiated by Indian allottees by a permit, and that priorities depend upon certificates issued pursuant thereto. In the pretrial conference in this case, the water officials took the position that water would be distributed only according to such certificates. That position was apparently modified in the brief of the Attorney General, as already mentioned. The dispute herein concerning the rights of plaintiffs and persons situated likewise apparently has been of long standing and it would seem to be highly advisable that their rights and the rights of the water officials and the rights of the many appropriators of Owl Creek should be finally settled. There is nothing to forbid the plaintiffs from bringing

an action to adjudicate their rights. It would seem, however, to be unfortunate to compel the plaintiffs, who apparently have limited resources, to bring such action and serve notice on all the numerous interested parties. The Board of Control of the state has large powers. The plaintiffs, or some of them, appear to have some water rights, however limited they may be, and they should not be deprived thereof unjustly. To settle the controversy herein, the Board of Control in cooperation with plaintiffs and others situated likewise, should proceed to determine the rights of the latter by proceedings similar to those taken in other cases.

Even if we are wrong in the foregoing conclusions, still we are unable to see how we can reverse the holding of the trial court denying an injunction for the simple reason, if for no other, that the means to grant one were not furnished to the court. Plaintiffs might well have followed the pattern set in United States v. Hampleman decided by the federal court of Wyoming in 1916 and cited to us in the reply brief of plaintiffs. In that case the petition set forth the specific number of acres owned and irrigated by the Indian allottees involved in that action, and we presume that the allegations were proved. In Lewis v. Hanson, 124 Mont. 492, 227 P.2d 70, 73, the court stated: "Before a party may have an injunction he must of necessity establish his rights thereto. * * * And in this case before plaintiff may prevail he must submit proof of the right to the use of a specified quantity of water." Plaintiffs failed to comply with this rule. There was some testimony that the lands of some of the plaintiffs were irrigated by the Indians, but there is no testimony of the specific number of acres irrigated by any of them. Nor is there any testimony as to whether or not the white men enlarged the use thereof as required under the rule of United States v. Hibner, supra, assuming the holding in that case to apply herein. In short, there is

no testimony which would have enabled the trial court to make an intelligent order of injunction. We are not altogether certain as to the lands owned by Bertha Jones. She testified that the lower half of 80 acres bought by her in 1934 was irrigated in 1927, and that she had grain on 60 acres in 1937. Even this, however, is hardly specific enough upon which to base an injunction. But if it were, then, since she joined other plaintiffs who cannot recover herein, she also cannot do so. 49 C.J. 140, 141; 71 C.J.S. § 72, p. 188; Gerard v. Mercer, 62 F. Supp. 28.

The judgment of the trial court is affirmed.

*Affirmed.*

RINER, C. J., and KLINE, D. J., concur.